

**FILE**
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE OCT 17 2013

~~Madsen, C.J.~~
CHIEF JUSTICE

This opinion was filed for record
at 8:00 a.m. on Oct 17, 2013

Ronald R. Carpenter
Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

CAROLA WASHBURN and )
JANET LOH, individually, and on )
behalf of the ESTATE OF BAERBEL )
K. ROZNOWSKI, a deceased person, )
)
         Respondents, )   No. 87906-1
)
v. )   EN BANC
)
CITY OF FEDERAL WAY, a )
Washington municipal corporation, )   Filed:    OCT 17 2013
)
         Petitioner. )
_____ )

FAIRHURST, J.—This case presents questions about the tort liability of a municipal corporation. Paul Chan Kim murdered his partner, Baerbel K. Roznowski, after officer Andrew Hensing of the Federal Way Police Department (Department) served Kim with an antiharassment order forbidding him to contact or remain near Roznowski. Roznowski's two daughters filed suit against the city of Federal Way (City), alleging that Hensing's negligent service of the order resulted in Roznowski's death at Kim's hands. The parties tried the case to a jury, which returned a verdict against the City.

The City claims the trial court erred in denying its CR 56(c) motion for summary judgment and its CR 50(a) motion for judgment as a matter of law because it owed Roznowski no duty under the public duty doctrine, foreclosing any tort liability. We disagree. The City had a duty to serve the antiharassment order on Kim, and because it had a duty to act, it had a duty to act with reasonable care in serving the order. We therefore affirm the trial court's denial of the City's motions, although we do so on different grounds than those relied on by the Court of Appeals.

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Roznowski and Kim began a troubled relationship in the 1990s. In 2008, Roznowski decided to end the relationship and move to California to live near her adult daughters. To move, Roznowski needed to sell her house. Kim stood in the way of the sale because, although he owned his own home, he resided at Roznowski's house and her home was filled with his belongings. Readying her property for sale therefore required ousting Kim and his possessions.

In late April 2008, Roznowski and Kim argued about her demands that he remove his belongings from her property. This fight escalated and Roznowski called 911 because she feared Kim might assault her.[1] Officers from the Department responded to the call and met with both Kim and Roznowski. Neither

---

[1] Roznowski had previously called 911 due to fears Kim would assault her.

Roznowski nor Kim appeared harmed, and the officers did not detect any evidence of physical violence. Nonetheless, the officers told Kim to "take a walk" and collect himself. Clerk's Papers at 842. With Kim out of the house, one of the officers discussed the situation with Roznowski and told her she could attempt to obtain a no-contact order against Kim.

Roznowski decided to seek court-ordered protection against Kim. She went to the King County Regional Justice Center, met with a domestic violence advocate, discussed her options, and then sought and obtained a "Temporary Protection Order and Notice of Hearing - AH" (hereinafter antiharassment order) from the King County Superior Court. Ex. 2, at 2. The antiharassment order prohibited Kim from surveilling Roznowski, contacting her, or entering or being within 500 feet of her residence. *Id.* at 3.

Roznowski asked the Department to serve the antiharassment order. The Department's service file included Roznowski's petition for the antiharassment order, the order, and a law enforcement information sheet (LEIS). The LEIS allows petitioners to provide law enforcement with information related to serving the court orders. Roznowski's LEIS informed the officers that Kim was her domestic partner, Kim did not know she had obtained an antiharassment order, Kim did not know the antiharassment order would force him out of Roznowski's home, and that Kim would likely react violently to service of the order. In the field

marked "Hazard Information," Roznowski noted that Kim had a history of assault. Ex. 2, at 1. The LEIS also asked that a Korean interpreter help serve the antiharassment order based on Kim's limited proficiency in English.

Officer Hensing served the antiharassment order two days later, early on a Saturday morning. Hensing offered contradictory testimony regarding his preparation for service, indicating that he either did not read the order or the LEIS, or, at best, gave them a cursory glance. Either way, he did not bring an interpreter.

When Hensing knocked on the door, Kim answered. Hensing saw Roznowski in the background inside the house while serving the antiharassment order, but he did not interact with her or inquire as to her safety. Hensing confirmed Kim's identity, handed him the antiharassment order, informed him he needed to appear in court, and left. Roznowski was left to explain to Kim what had happened—she had restrained him from contacting her and he needed to vacate the home. Another argument ensued, and Kim eventually left to run an errand.

Kim finished his errand, returned to the house, and attacked Roznowski with a knife before attempting to take his own life. Medical personnel arrived to find Roznowski bleeding to death, with Kim lying beside her.[2] Medical intervention

---

[2]The 911 call prompting police and medical response to the house came from a friend of Kim's who was with Kim on the errand just before Kim returned to the house and killed

failed to save Roznowski, who died from blood loss from the multiple stab wounds Kim inflicted.

Roznowski's daughters, Carola Washburn and Janet Loh (hereinafter collectively Washburn), filed suit against the City for Roznowski's wrongful death. The suit alleged various theories of negligence and sought damages for the daughters in their individual capacities and on behalf of Roznowski's estate.

The City moved for summary judgment, claiming that it owed Roznowski no duty under the public duty doctrine. The trial court denied the motion, finding that the antiharassment order required Kim to remain more than 500 feet away from Roznowski and that Hensing had failed in his duty to enforce the antiharassment order by leaving Kim in the house with Roznowski after serving the antiharassment order. The City moved for reconsideration of this decision, which the trial court denied. The City then sought discretionary review of the denial of summary judgment at the Court of Appeals, Division One, but the court commissioner denied the motion, and a panel of the court denied a motion to modify the commissioner's order.

At trial, much of the testimony offered by Washburn concerned the importance of proper service of an antiharassment order. Expert testimony from

---

Roznowski. The friend called police because some of Kim's statements led him to believe Kim might kill himself.

Karil Klingbeil, a family violence counselor, informed the jury about the point of separation between the abuser and victim. Klingbeil testified that the point of separation is a "very volatile and dangerous period" because the abuser learns that he or she has lost control of the victim. Verbatim Excerpt of Proceedings (VEP) (Dec. 9, 2010 at 9:00 a.m.) at 9-10. Another expert, Dr. Anne Ganley, a psychologist focusing on domestic violence, testified that at the point of separation, the batterer can "explode." VEP (Dec. 14, 2010 at 10:00 a.m.) at 41. Roznowski's LEIS informed Hensing that Kim did not know she had sought protection, meaning that the point of separation occurred when Hensing served the antiharassment order.

The former police chief of the city of Bellevue, Donald Van Blaricom, testified that Hensing's service of the antiharassment order did nothing to minimize the danger Kim posed to Roznowski as a result of service of the antiharassment order. Van Blaricom stressed that proper service required four things: (1) reading the petition, antiharassment order, and LEIS because the officer needed to know how the recipient would likely react to service to prepare for a violent outburst; (2) ensuring that the recipient understood the contents and effect of the antiharassment order, which might require the officer to bring a translator; (3) contacting the petitioner to verify his or her safety and health as part of effective service; and (4)

enforcing the antiharassment order, which, in this case, required at a minimum that Hensing tell Kim that Kim needed to leave.

Norman Stamper, former chief of the Seattle Police Department, largely echoed Van Blaricom's analysis and ultimate conclusion. In particular, Stamper stated it was "astonishing" that Hensing had not read the LEIS because it provided information critical to "prevent murder." VEP (Dec. 13, 2010 at 10:15 a.m.) at 25. Stamper found it "hugely significant" that Hensing did not contact Roznowski after seeing her in the background, but instead left after serving the antiharassment order, essentially setting Roznowski up for a "horrible crime." *Id.* at 58, 48.

Washburn introduced testimony stating that Hensing's improper service of the antiharassment order led to Roznowski's death. Ganley testified that offenders with Kim's psychological profile, individuals "highly compliant to outside authority, particularly to law enforcement," would not have returned to kill a victim in the face of proper service by police. VEP (Dec. 14, 2010 at 10:00 a.m.) at 44. Instead, these individuals "would have followed the protection order, they would have not wanted to be anything but law abiding and would not have wanted to come back and [be] arrested. This type of profile would not have tracked the person down and committed the homicide." *Id.* at 44. Klingbeil and Van Blaricom concurred that proper service of the antiharassment order would have minimized danger to Roznowski.

At the close of Washburn's case-in-chief, the City moved for judgment as a matter of law under CR 50(a). The City argued that Washburn failed to present evidence sufficient to prove the City owed Roznowski any actionable duty. The trial court denied the motion.

In its defense, the City offered an expert who testified that Hensing acted reasonably in serving the antiharassment order. The expert, Seattle Police Department Sergeant Thomas Ovens, testified that Hensing had appropriately prepared himself by reviewing the antiharassment order and serving it; Ovens stated Hensing did not need to read every word on the LEIS, only to generally familiarize himself with it.

Ovens' testimony and the City's cross-examination of Washburn's witnesses focused on the differences between an antiharassment order and a domestic violence protection order. A domestic violence protection order requires police to help the protected party obtain exclusive control of the residence, and police must arrest the restrained party for a violation of the order. Antiharassment orders have neither of these features. Ovens testified that based on the type of antiharassment order Hensing served, Hensing could not immediately enforce it because he needed to give Kim time to remove his belongings. Given the characteristics of the antiharassment order at issue in this case, Ovens testified that Hensing acted reasonably in his service of the antiharassment order.

8

The jury instruction conference involved extensive discussions as to whether to give an instruction stating that the City owed Roznowski a duty of ordinary care in serving the antiharassment order. The City had "strenuous" objections to any such instruction based on its public duty doctrine argument. VEP (Dec. 20, 2010 at 9:00 a.m.) at 3. The trial court indicated that it understood the City's objection to any such instruction to be the substance of the instruction when discussing the issue with Washburn's counsel:

> [Washburn's counsel]: A duty instruction is always included as in an ordinary negligence case, and [the City's] objection to that instruction was not based on the words, it is based on [the City's] public duty argument.
>
> [The trial court]: I know.
>
> [Washburn's counsel]: And it is essentially related to that, not related to the wording of the instruction or the Court's previous ruling that Federal Way does owe a duty of care.

*Id.* at 5.

The trial court decided to give a general duty instruction, stating, "I am persuaded that a duty of care instruction needs to be given. I understand the defendant's objection to it, why it is being made, but I think the duty of care instruction is implicit in allowing the case to go forward." *Id.* at 73. The court then discussed the specific wording of the instruction. The City's counsel admitted that under the trial court's understanding, the trial court's proposed wording was

9

appropriate, but again objected that the instruction should not be given at all. When the time came to offer formal objections to the jury instructions, the City objected to the trial court's refusal to give the City's public duty doctrine instructions. The City also objected to the trial court instructing the jury that the City owed a duty of ordinary care.

After deliberations, the jury returned a verdict for Washburn. The City appealed the verdict to the Court of Appeals, Division One. The City assigned error to the trial court's denial of its CR 56(c) and CR 50(a) motions, again arguing that it owed Roznowski no legal duty. Br. of Appellant City (City's Br.) at 3.[3] The Court of Appeals affirmed in a published opinion. *Washburn v. City of Federal Way*, 169 Wn. App. 588, 283 P.3d 567 (2012).

The Court of Appeals first held that by failing to properly object and assign error to the jury instruction related to the duty of ordinary care in serving the antiharassment order, the City allowed the instruction to become the law of the case. *Id.* at 599-607. The Court of Appeals determined that the City objected to the wording of the instruction, not its substance. *Id.* at 602-03. The Court of Appeals also noted that the City's briefing failed to assign error to the trial court's decision to give the instruction. *Id.* at 605. The Court of Appeals examined the record to see

---

[3]The City also appealed the trial court's decision to grant Washburn a new trial only on the issue of damages. City's Br. at 4. The Court of Appeals rejected this claim, and the City does not renew it here. *Washburn v. City of Federal Way*, 169 Wn. App. 588, 616-18, 283 P.3d 567 (2012).

if sufficient evidence supported a jury verdict based on the instruction and found that the testimony about Hensing's service of the antiharassment order provided such evidence. *Id.* at 607-08.

The Court of Appeals' decision next addressed the denial of the City's CR 56(c) and CR 50(a) motions. The Court of Appeals noted that a trial generally bars review of a denial of a summary judgment motion because the trial resolves material issues of fact. *Id.* at 610 (citing *Kaplan v. Nw. Mut. Life Ins. Co.*, 115 Wn. App. 791, 65 P.3d 16 (2003)). The Court of Appeals noted a limited exception to this rule exists where summary judgment turns solely on an issue of substantive law rather than factual matters. *Id.* at 578 (citing *Univ. Village Ltd. Partners v. King County*, 106 Wn. App. 321, 324, 23 P.3d 1090 (2001)). However, the Court of Appeals determined the question of duty here required resolution of material issues of fact, precluding review of the order denying summary judgment. *Id.* at 611.

The Court of Appeals refused to review the City's CR 50(a) motion because the City had not renewed the motion under CR 50(b) after the jury returned its verdict. *Id.* at 611-12. The Court of Appeals based this holding upon United States Supreme Court precedent requiring a postverdict motion under the Federal Rules of Civil Procedure in order to preserve a claim that the trial court had erroneously denied a preverdict motion for judgment as a matter of law. *Id.* at 612-15 (citing

11

*Ortiz v. Jordan,* ___ U.S. ___, 131 S. Ct. 884, 178 L. Ed. 2d 703 (2011) and

*Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.,* 546 U.S. 394, 126 S. Ct. 980, 163

L. Ed. 2d 974 (2006)).

Because it would not review the CR 56(c) or CR 50(a) motion denials, and

because substantial evidence supported the verdict under the law of the case

doctrine, the Court of Appeals affirmed the jury's verdict. *Id.* at 619. We granted

discretionary review of the City's petition. *Washburn v. City of Federal Way,* 176

Wn.2d 1010, 297 P.3d 709 (2013).

## II.  ISSUES PRESENTED

A.  Did the City preserve its objection to jury instruction 12, which stated that the City owed Roznowski a duty of ordinary care in serving the antiharassment order?

B.  Did the City's failure to renew its CR 50(a) motion postverdict with a CR 50(b) motion waive review of the denial of the CR 50(a) motion?

C.  Did the trial court properly deny the City's CR 56(c) and CR 50(a) motions?

## III.  ANALYSIS

A.  The Court of Appeals erred in holding that the City did not object to jury instruction 12

The City argues that the Court of Appeals erred in determining that the City

did not object to the trial court's decision to give jury instruction 12. The City

contends that the trial court was well aware of the substance of its objection to the

instruction, so its trial objection sufficiently preserved the issue for review. We agree.

CR 51(f) requires a party objecting to a jury instruction to "state distinctly the matter to which he objects and the grounds of his objection." This objection allows the trial court to remedy error before instructing the jury, avoiding the need for a retrial. *Egede-Nissen v. Crystal Mt., Inc.*, 93 Wn.2d 127, 134, 606 P.2d 1214 (1980). "The pertinent inquiry on review is whether the exception was sufficient to apprise the trial judge of the nature and substance of the objection." *Crossen v. Skagit County*, 100 Wn.2d 355, 358, 669 P.2d 1244 (1983).

So long as the trial court understands the reasons a party objects to a jury instruction, the party preserves its objection for review. *Crossen* involved a suit against Skagit County over allegations that the county had negligently failed to warn motorists about a dangerous stretch of road. 100 Wn.2d at 357. At trial, Crossen asked for three jury instructions with citations to a uniform traffic control manual. *Crossen v. Skagit County*, 33 Wn. App. 243, 245-46, 653 P.2d 1365 (1982). The trial court refused, and Crossen objected. *Id.* The jury returned a verdict for the county. *Id.* at 245. The Court of Appeals refused to reach the merits of Crossen's appeal, holding that her failure to present argument as to why the instructions were necessary precluded review. *Id.* at 246. We reversed, holding that a party preserves an allegation of instructional error for review if they object and

the trial court understands the substance of the objection. *Crossen*, 100 Wn.2d at 359. We reviewed the trial record, found "extended discussions" about the jury instructions, and determined that the trial court understood the nature of Crossen's objection. *Id.*

Similarly, a party's objection to a trial court's failure to give its competing instructions will preserve any objection to the instruction actually given. *Falk v. Keene Corp.*, 113 Wn.2d 645, 782 P.2d 974 (1989), involved a products liability claim against an asbestos manufacturer. *Id.* at 646. The Falks objected to the trial court's refusal to instruct the jury that it should determine the manufacturer's liability using principles of strict liability. *Id.* at 647. After overruling the Falks' objection, the trial court instructed the jury that it should use principles of negligence to determine the existence of a design defect, and the Falks did not object to this instruction. *Id.* at 646-47. We held that although the Falks had not objected specifically to the instruction given by the trial court, they had objected to the failure to give their proposed design defect instruction and therefore had apprised the trial court of their objection to the design instruction given. *Id.* at 658. By doing so, the Falks preserved their claim of instructional error for review. *Id.*

Here, the trial court manifested an understanding of the City's position during the conference to discuss jury instructions. Contrary to the Court of Appeals' reading of the City's objections, the trial court recognized that the City's

issues with the duty of ordinary care instruction arose from the substance of the instruction, not its wording. The trial court later acknowledged it understood the City's position that it owed Roznowski no duty but determined to give the instruction anyway.

The City then formally objected to the trial court's refusal to give the City's instructions related to its public duty doctrine argument and objected to the trial court instructing the jury that the City owed a duty of ordinary care. Under *Crossen* and *Falk*, either of these objections preserved the allegation that jury instruction 12 was erroneous given the trial court's understanding of the City's position.

Washburn argues that the City did not preserve its objection because it did not offer an instruction containing a correct statement of the law.[4] Washburn is incorrect. We do not necessarily require a correct alternate instruction to preserve an objection. *See Joyce v. Dep't of Corr.*, 155 Wn.2d 306, 325, 119 P.3d 825 (2005). However, even if we accepted Washburn's argument, that would only waive the objection the City made concerning the refusal to give its proposed public duty doctrine instructions. The City also objected to the decision to give Washburn's proposed instructions. The trial court correctly understood this

---

[4]Washburn essentially merges the question of preservation with the merits of the City's claim. The City objected to the failure to give its proposed instructions to the jury. That suffices to preserve the argument so that an appellate court may determine if the trial court erred in refusing to give the instructions.

objection as substantively objecting to instructing the jury that the City had any duty at all.

Because the trial court was well aware of the nature of the City's objection, the Court of Appeals erred by holding the City did not preserve its objections to jury instruction 12.[5]

B.      The Court of Appeals erred by holding the City failed to preserve the denial of its CR 50(a) motion for review

The Court of Appeals held that the City waived review of the denial of its CR 50(a) motion by failing to renew it with a CR 50(b) motion after the jury verdict.[6] The Court of Appeals relied on a line of federal cases interpreting Fed. R.

---

[5]The Court of Appeals determined jury instruction 12 was the law of the case for an additional reason—the City had failed to assign error to the trial court's determination to give the instruction. *Washburn*, 169 Wn. App. at 599 n.33, 605. Washburn adopts this argument. Resp'ts' Suppl. Br. at 12-13. The City appears not to have assigned error to the instruction because it wanted the Court of Appeals to review the denials of its CR 56(c) and CR 50(a) motions rather than the sufficiency of the evidence supporting a verdict with the instruction as the law of the case. Judgment as a matter of law sought with a CR 50(a) motion is governed by the applicable substantive law, not the trial court's instructions to the jury. *Kim v. Dean*, 133 Wn. App. 338, 349, 135 P.3d 978 (2006). A motion for summary judgment seeks, at root, judgment as a matter of law. CR 56(c). Consequently, this same principle guides review of the denial of summary judgment. *See Kim*, 133 Wn. App. at 349.

As discussed below, we hold that the Court of Appeals erred in holding that the City waived review of the denial of its CR 50(a) motion. Consequently, the instructional issue does not control the City's liability. Nonetheless, the City assigned error to this portion of the Court of Appeals decision, we granted review on the issue, and we therefore consider it.

[6]CR 50 provides:
(a) **Judgment as a Matter of Law.**
(1) *Nature and Effect of Motion.* If, during a trial by jury, a party has been fully heard with respect to an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find or have found for that party with respect to that issue, the court may grant a motion for judgment as a matter of law against the party on any claim, counterclaim, cross claim, or third party claim that cannot

16

Civ. P. 50(b), the analogous federal rule. Because the federal interpretation of Fed. R. Civ. P. 50 never took root in Washington, we reverse the Court of Appeals on this point.

"Where a state rule parallels a federal rule, analysis of the federal rule may be looked to for guidance" in interpreting the state rule. *Beal v. City of Seattle*, 134 Wn.2d 769, 777, 954 P.2d 237 (1998). However, we follow the federal analysis only if we find its reasoning persuasive. *Id.*

Any party asking us to adopt the federal interpretation of a rule bears the burden of overcoming our reluctance to reform rules practice through judicial interpretation rather than rule making. For example, in *McCurry v. Chevy Chase*

---

under the controlling law be maintained without a favorable finding on that issue. Such a motion shall specify the judgment sought and the law and the facts on which the moving party is entitled to the judgment. A motion for judgment as a matter of law which is not granted is not a waiver of trial by jury even though all parties to the action have moved for judgment as a matter of law.

(2) *When Made.* A motion for judgment as a matter of law may be made at any time before submission of the case to the jury.

**(b) Renewing Motion for Judgment After Trial; Alternative Motion for New Trial.** If, for any reason, the court does not grant a motion for judgment as a matter of law made at the close of all the evidence, the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. The movant may renew its request for judgment as a matter of law by filing a motion no later than 10 days after entry of judgment—and may, alternatively request a new trial or join a motion for a new trial under rule 59. In ruling on a renewed motion, the court may:

    (1) if a verdict was returned:
        (A) allow the judgment to stand[,]
        (B) order a new trial, or
        (C) direct entry of judgment as a matter of law; or
    (2) if no verdict was returned[:]
        (A) order a new trial, or
        (B) direct entry of judgment as a matter of law.

*Bank, FSB*, 169 Wn.2d 96, 100, 233 P.3d 861 (2010), Chevy Chase Bank asked us to affirm a trial court's dismissal of contract and consumer protection claims against it under CR 12(b)(6). As part of its argument, the bank asked us to adopt the new federal standard for dismissal into our CR 12(b)(6) jurisprudence. *Id.* at 101 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)).

We rejected the bank's invitation for two reasons. First, neither party demonstrated that the concerns leading to the change in federal interpretation held true in Washington, nor did the parties address the benefits or problems associated with adopting the federal standard. *Id.* at 102-03. This left us with "no similar basis to fundamentally alter our interpretation" of the state dismissal standard that we had adhered to "for nearly 50 years." *Id.* at 103. Second, we expressed reluctance to alter an interpretation of the rules without using the rule making process, which allowed consideration of all the relevant concerns and the opinions of "the legal community and the community at large." *Id.*

Washburn fails to overcome our reluctance to change rule practice by a judicial interpretation. Washburn offers only one argument for disregarding our practice and following the federal rule, namely, that it "requir[es] the parties to be focused on legal issues" by fixing factual matters through the jury verdict, preserving judicial resources. Resp'ts' Suppl. Br. at 17. Washburn's argument is

unpersuasive. Our review of a trial court's decision on a motion for judgment as a matter of law already requires us to review factual matters in the light most favorable to the nonmoving party. *Hizey v. Carpenter*, 119 Wn.2d 251, 271-72, 830 P.2d 646 (1992). Further, the benefits of the renewal requirement in terms of judicial economy have been questioned. *See Johnson v. New York, N.H. & H.R. Co.*, 344 U.S. 48, 55-56, 60-62, 73 S. Ct. 125, 97 L. Ed. 77 (1952) (Frankfurter, J., dissenting).

We find no reason to depart from long-followed state rules practice without the rule making process.[7] *See, e.g., Davis v. Microsoft Corp.*, 149 Wn.2d 521, 525, 70 P.3d 126 (2003) (reviewing a decision to deny a CR 50(a) motion despite the lack of renewal by CR 50(b) motion); *Amsbury v. Cowles Publ'g Co.*, 76 Wn.2d 733, 458 P.2d 882 (1969) (same). By necessity, judicial opinions focus on the case, facts, and parties at hand, and any opinion reflects that focus. In contrast, the rule making process allows all concerned stakeholders to provide input on any proposed change to a rule or its interpretation. *McCurry*, 169 Wn.2d at 103. Just as in *McCurry*, we are hesitant to upset settled practice without input from entities

---

[7]Washburn appears to contend that there is no reason to justify adopting the renewal requirement because a recent amendment to CR 50 has already adopted the requirement. In 2005, CR 50 was amended to conform to the federal practice and require that the parties make any CR 50(a) motion prior to submission of the case to the jury or else waive the chance to make the motion after the jury returns a verdict. 4 KARL B. TEGLAND, WASHINGTON PRACTICE: RULES PRACTICE CR 50, at 211 (6th ed. 2013). Washburn mischaracterizes the amendment. The amendment does not adopt the renewal requirement; rather, the amendment adopts a waiver requirement for making a CR 50(a) motion in the first place.

like the plaintiff and defense bars, as well as the trial courts, all of which should weigh in on the desirability of adopting the renewal requirement.

C.    The trial court properly denied the City's CR 56(c) and CR 50(a) motions because the City owed Roznowski two duties in serving the antiharassment order on Kim

The City's main argument on appeal is that the trial court erred in denying the City's CR 56(c) and CR 50(a) motions because the City owed Roznowski no legal duty under the public duty doctrine. We hold that the City owed two different duties to Roznowski—a legal duty to serve the antiharassment order and a duty to act reasonably in doing so. We hold that this duty to act with reasonable care, under these facts, meant taking reasonable steps to guard against the possibility that Kim would harm Roznowski as a result of the service of the antiharassment order. Consequently, we affirm the trial court's decisions to deny the City's CR 56(c) and CR 50(a) motions.

1.    Standard of Review

"'The standard of review of an order of summary judgment is de novo, and the appellate court performs the same inquiry as the trial court.'" [8] *Sheikh v. Choe*, 156 Wn.2d 441, 447, 128 P.3d 574 (2006) (quoting *Jones v. Allstate Ins. Co.*, 146

---

[8] As the Court of Appeals noted, appellate review of the denial of a summary judgment motion is inappropriate after a trial unless the motion turned pure issues of law. *Univ. Village*, 106 Wn. App. at 324. Because we hold the City owed Roznowski a duty, we find it unnecessary to determine whether the exception might have applied. The trial court properly denied both the motions.

Wn.2d 291, 300, 45 P.3d 1068 (2002)). "The standard on a motion for judgment as a matter of law mirrors that of summary judgment."[9] *Id.* We review de novo the existence of a duty as a question of law. *Munich v. Skagit Emergency Commc'n Ctr.*, 175 Wn.2d 871, 877, 288 P.3d 328 (2012).

> 2. City owed Roznowski actionable legal duties related to serving the antiharassment order

In 1961, the legislature abolished the sovereign immunity possessed by the State and its agencies after "vigorous attacks" on the immunity. *Kelso v. City of Tacoma*, 63 Wn.2d 913, 914, 390 P.2d 2 (1964); LAWS OF 1961, ch. 136, § 1). In 1967, the legislature clarified that this abolition of sovereign immunity extended to local governmental entities such as municipalities. LAWS OF 1967, ch. 164, § 1.

By these enactments, governmental entities in Washington are liable for their "tortious conduct" to the "same extent" as "a private person or corporation." RCW 4.92.090(2); RCW 4.96.010. Consequently, a plaintiff claiming that a municipality has acted negligently may recover after proving "'the existence of a duty, a breach thereof, a resulting injury, and proximate causation between the breach and the resulting injury.'" *Michaels v. CH2M Hill, Inc.*, 171 Wn.2d 587,

---

[9]We may affirm a trial court's disposition of a motion for summary judgment or judgment as a matter of law on any ground supported by the record. *Mountain Park Homeowners Ass'n v. Tydings*, 125 Wn.2d 337, 344, 883 P.2d 1383 (1994); *Rawlins v. Nelson*, 38 Wn.2d 570, 578, 231 P.2d 281 (1951).

605, 257 P.3d 532 (2011) (quoting *Schooley v. Pinch's Deli Mkt., Inc.*, 134 Wn.2d 468, 474, 951 P.2d 749 (1998)).

Because governments, unlike private persons, are tasked with duties that are not legal duties within the meaning of tort law, we carefully analyze the threshold element of duty in negligence claims against governmental entities. *Osborn v. Mason County*, 157 Wn.2d 18, 27-28, 134 P.3d 197 (2006); *Munich*, 175 Wn.2d at 887 (Chambers, J., concurring) ("Private persons do not govern, pass laws, or hold elections. Private persons are not required by statute or ordinance to issue permits, inspect buildings, or maintain the peace and dignity of the state of Washington."). We employ the public duty doctrine as a "focusing tool" to determine "whether a duty is actually owed [to] an individual claimant rather than the public at large." *Munich*, 175 Wn.2d at 878; *Cummins v. Lewis County*, 156 Wn.2d 844, 866, 133 P.3d 458 (2006). Where the plaintiff claims the governmental entity has breached a duty owed to the public in general, he or she may not recover in tort for lack of an actionable legal duty. *J&B Dev. Co. v. King County*, 100 Wn.2d 299, 304-05, 669 P.2d 468 (1983) ("a duty to all is a duty to no one"), *overruled on other grounds by Taylor v. Stevens County*, 111 Wn.2d 159, 759 P.2d 447 (1988) and *Meaney v. Dodd*, 111 Wn.2d 174, 759 P.2d 455 (1988).

The public duty doctrine has exceptions. *Bailey v. Town of Forks*, 108 Wn.2d 262, 268, 737 P.2d 1257, 753 P.2d 523 (1987) (summarizing the four

22

commonly cited exceptions to the public duty doctrine). Saying an exception applies is simply shorthand for saying the governmental entity owes a duty to the plaintiff. *Taggart v. State*, 118 Wn.2d 195, 218, 822 P.2d 243 (1992). As with any defendant, the true question in a negligence suit against a governmental entity is whether the entity owed a duty to the plaintiff, not whether an exception to the public duty doctrine applies it. *See id.*

      (a)    Chapter 10.14 RCW imposed a legal duty on the Department to serve the antiharassment order on Kim

One of the exceptions to the public duty doctrine is the legislative intent exception. The exception allows a plaintiff to claim that a governmental entity owes him or her a legal duty where a legislative enactment "evidences a clear legislative intent to identify and protect a particular and circumscribed class of persons." *Honcoop v. State*, 111 Wn.2d 182, 188, 759 P.2d 1188 (1988). Typically, we look to the legislature's statement of purpose to discover its intent. *Baerlein v. State*, 92 Wn.2d 229, 234, 595 P.2d 930 (1979). The legislative intent exception recognizes that the legislature may impose legal duties on persons or other entities by proscribing or mandating certain conduct. *See, e.g., Schooley*, 134 Wn.2d at 474-75.

We recognized the legislative intent exception in *Halvorson v. Dahl*, 89 Wn.2d 673, 674, 574 P.2d 1190 (1978). The suit in *Halvorson* arose out of a hotel

fire. Halvorson's husband died in the fire, and she sued the hotel owner and officials of the city of Seattle. *Id.* Regarding the claim against city officials, Halvorson argued they were liable for their failure to enforce the provisions of the city's "building, housing, and safety codes." *Id.* The city of Seattle had declared that it enacted the code sections at issue for the benefit of the individuals living in the buildings in addition to the benefit of the general public. *Id.* at 677. Based on the intent to protect those dwelling within the buildings, we found a duty owed specifically to individuals like Halvorson's husband. *Id.* at 676-77. We determined that Halvorson could maintain an action against the city for "culpable neglect regarding, or indifference to, . . . noncompliance" with the code provisions intended to protect the building occupants. *Id.* at 678.

Just as the city of Seattle demonstrated an intent to protect specific individuals with the code provisions in *Halvorson*, Washington's legislature showed an intent to protect specific individuals in passing chapter 10.14 RCW. As the legislature declared, "The legislature finds that serious, personal harassment through repeated invasions of a person's privacy by acts and words showing a pattern of harassment designed to coerce, intimidate, or humiliate the victim is increasing. The legislature further finds that the prevention of such harassment is an important governmental objective." RCW 10.14.010. To give effect to this intent to protect victims of harassment, chapter 10.14 RCW creates an

24

antiharassment order to "prevent[] all further unwanted contact between the victim and the perpetrator" and requires municipal police officers to serve the order unless the petitioner chooses otherwise. RCW 10.14.010, .100(2).[10]

This statement of purpose satisfies the requirements of the legislative intent exception. By its terms, RCW 10.14.010 circumscribes a particular class of persons, those people suffering harassment at the hands of others. RCW 10.14.010 also evidences a legislative intent to protect that particular class of persons by announcing that the prevention of this unwanted contact rises to the level of an important governmental interest. Finally, chapter 10.14 RCW implements a means of achieving this goal, creating antiharassment orders that municipal police officers must serve unless the petitioner chooses otherwise. RCW 10.14.080, .100(2).

The City contends that the legislative intent exception applies only where the statute at issue imposes a duty on the governmental entity. City's Br. at 31-32 (citing *Donohoe v. State*, 135 Wn. App. 824, 142 P.3d 654 (2006)). Specifically, the City claims that the legislature imposed no "mandatory *duty* to *guarantee* the safety of citizens who obtain anti-harassment orders." City's Br. at 32.

The City's argument misunderstands the application of the legislative intent exception to this case. While chapter 10.14 RCW imposes no duty to guarantee the

---

[10]RCW 10.14.100(2) provides that "[t]he sheriff of the county or the peace officers of the municipality in which the respondent resides shall serve the respondent personally unless the petitioner elects to have the respondent served by a private party."

safety of citizens like Roznowski, it does impose on police officers a duty to serve antiharassment orders. *See Goldmark v. McKenna*, 172 Wn.2d 568, 575-76, 259 P.3d 1095 (2011) (The use of the word shall "is presumptively imperative and creates a mandatory duty unless a contrary legislative intent is shown."). The City concedes that RCW 10.14.100 required officers of the Department to serve Kim with the antiharassment order. Reply Br. of Appellant City at 20.

Under the legislative intent exception, if the City's discharge of this duty to act, service of the order, constituted "culpable neglect," it bears liability in tort. *Halvorson*, 89 Wn.2d at 678.

<blockquote>

(b)     The City owed Roznowski a duty to guard against the danger she faced at Kim's hands because Hensing's actions created that danger
</blockquote>

Actors have a duty to exercise reasonable care to avoid the foreseeable consequences of their acts. RESTATEMENT (SECOND) OF TORTS § 281 cmts. c, d (1965). This duty requires actors to avoid exposing another to harm from the foreseeable conduct of a third party. RESTATEMENT § 302. Criminal conduct is generally unforeseeable. *Nivens v. 7-11 Hoagy's Corner*, 133 Wn.2d 192, 205 n.3, 943 P.2d 286 (1997). Consequently, there is generally no duty to prevent third parties from causing criminal harm to others. *Robb v. City of Seattle*, 176 Wn.2d 427, 429-30, 295 P.3d 212 (2013).

Criminal conduct is, however, not unforeseeable per se. *See, e.g., Bernethy v. Walt Failor's, Inc.*, 97 Wn.2d 929, 934, 653 P.2d 280 (1982) (citing *McLeod v. Grant County Sch. Dist. 128*, 42 Wn.2d 316, 321, 255 P.2d 360 (1953)). Recognizing this, we have adopted *Restatement* § 302B, which provides that, in limited circumstances, an actor's duty to act reasonably includes a duty to take steps to guard another against the criminal conduct of a third party. *Robb*, 176 Wn.2d at 439-40.

Specifically, *Restatement* § 302B provides that "'[a]n act or an omission may be negligent if the actor realizes or should realize that it involves an unreasonable risk of harm to another through the conduct of the other or a third person which is intended to cause harm, even though such conduct is criminal.'" *Robb*, 176 Wn.2d at 434 (alteration in original) (quoting RESTATEMENT § 302B). The duty to protect against the criminal acts of third parties can arise "'where the actor's own affirmative act has created or exposed the other to a recognizably high degree of risk of harm through such misconduct.'" *Id.* (emphasis omitted) (quoting RESTATEMENT § 302B cmt. e).

Governmental entities and employees, like municipal police officers, may owe a duty under *Restatement* § 302B. *Robb*, 176 Wn.2d at 439-40. *Robb*, for

example, involved a *Terry*[11] stop conducted by two Seattle police officers. *Robb*, 176 Wn.2d at 430. During the stop, the officers noticed several shotgun shells on the ground near the two men the officers detained. *Id.* The officers failed to seize the shells, and after the stop, one of the men returned to the scene, retrieved the shells, and later used them to kill a motorist. *Id.* The motorist's wife filed suit against the city of Seattle for the wrongful death. The city moved for summary judgment, apparently on public duty doctrine grounds. *Id.* at 431-32. The trial court analyzed the question in terms of affirmative acts: if the officers had acted affirmatively, they owed a duty to the motorist under common law principles; if they had not, the public duty doctrine barred the suit. *Id.* The trial court determined the officers had acted affirmatively, though negligently, and denied the city's motion for summary judgment.

Despite agreeing with the trial court's analytical framework, we reversed its decision to deny the city of Seattle's motion for summary judgment because we concluded that, absent some kind of special relationship between the plaintiff and defendant under *Restatement* § 302B, only misfeasance, not nonfeasance, could create a duty to act reasonably to prevent foreseeable criminal conduct. We determined the police lacked any special relationship with Robb and that their actions had constituted nonfeasance rather than misfeasance. *Robb*, 176 Wn.2d at

---

[11]*Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

439. We based this conclusion on the fact that the officer's conduct had not created a new risk to Robb. *Id.* at 437. Instead, they had "failed to remove a risk" not of their own creation when they failed to pick up the shotgun shells. *Id.* at 438. "Simply put, the situation of peril in this case existed before law enforcement stopped Behre, and the danger was unchanged by the officer's actions." *Id.*

The Court of Appeals has also applied *Restatement* § 302B to governmental liability. *Parrilla v. King County*, 138 Wn. App. 427, 157 P.3d 879 (2007). In *Parrilla*, a fight broke out on a metro bus. *Id.* at 430. The driver attempted to end the fight by pulling the bus over to the side of the road and ordering everyone off the bus. *Id.* at 430-31. Every passenger left the bus except for one man, Courvoisier Carpenter, who was high on phencyclidine. *Id.* at 431. The driver eventually exited the bus, leaving the motor running and Carpenter alone on the bus. *Id.* Carpenter stole the bus and drove off, injuring several people, including the Parrillas. *Id.* The Court of Appeals analyzed the Parrillas' suit under *Restatement* § 302B and held that the county owed a duty to protect individuals like the Parrillas from Carpenter's foreseeable criminal acts. *Id.* at 433-41. The Court of Appeals found the duty arose because the bus driver's affirmative acts exposed the Parrillas to foreseeable harm at Carpenter's hands. *Id.* at 438-39. Specifically the Court of Appeals found the driver had acted affirmatively by getting off the bus and leaving a dangerous situation behind. *Id.*

We hold that, under the facts of this case, Hensing, as part of his duty to act reasonably, owed Roznowski a duty to guard against the criminal conduct of Kim. We find several factors created this duty.

First, Hensing knew, or should have known, that Kim could or would react violently to the service of the antiharassment order for several reasons. The LEIS itself alerted Hensing to this fact. Roznowski filled out the LEIS by noting that Kim had a history of assault and would likely react violently to service of the antiharassment order. Further, the police are generally aware of the problem of separation violence. The testimony of Van Blaricom, Stamper, and Ovens all reflect this, as does the very existence of the LEIS itself, which police departments created to help alert officers serving these types of orders to the risks they faced.

Second, Hensing knew, or should have known, that he was serving Kim at Roznowski's house. The LEIS and service file indicated as much. Hensing also knew, or should have known, that the woman he saw in the background was Roznowski given that he served Kim at her house.

Given the first two factors—danger and Roznowski's presence—plus the possible need for a translator, when Hensing handed Kim the antiharassment order and walked away, Hensing created a situation that left Roznowski alone with Kim as Kim realized, or was about to realize, that Roznowski had ended their relationship. Hensing should have realized that, like the bus driver in *Parrilla*, and

unlike the officers in *Robb*, he had created a new and very real risk to Roznowski's safety based on Kim's likely violent response to the antiharassment order and his access to Roznowski.

The jury heard extensive testimony on the simple steps Hensing could have taken to eliminate the risk to Roznowski. He could have ordered Kim to leave the house and stood by to make sure Kim did so without harming Roznowski. Ganley and Van Blaricom testified that doing so would have prevented Kim from murdering Roznowski. Hensing, however, did neither of these things. He walked away, leaving Roznowski alone in her house with Kim and the reaction from the service of the antiharassment order.

The City argues *Restatement* § 302B creates no duty here because, like *Robb*, this is a case of nonfeasance rather than one of misfeasance. In support of this argument, the City cites jury instruction 5, which the City argues frames Washburn's claims in terms of nonfeasance. The City's argument mischaracterizes Washburn's claims. The bulk of testimony offered by Washburn at trial concerned Hensing's misfeasance in serving the antiharassment order. Washburn does tend to frame it in terms of a failure to perform, such as the failure to read the LEIS, the failure to bring an interpreter, and Hensing's decision to walk away instead of standing by to monitor Kim. Washburn, however, offers these examples as a list of the ways Hensing served the antiharassment order improperly.

31

The City's other argument against imposing a duty under *Restatement* § 302B is that doing so runs counter to the justification for the public duty doctrine. Am. Resp. to Br. of Amici Curiae Legal Voice and Wash. Women Lawyers at 3, 6. The City notes that it has a statutory duty to serve orders like the one at issue here, and that imposing liability will deter beneficial services such as this.[12] The City equates the existence of a duty with liability. As we have noted, governmental entities are not liable if they act reasonably. *Bailey*, 108 Wn.2d at 270-71. Nor are governmental entities liable if their negligence does not proximately cause the plaintiff's injuries. Unforeseeable intervening acts break the chain of causation between "the defendant's negligence and the plaintiff's injury." *Schooley*, 134 Wn.2d at 482. As mentioned above, criminal acts are often unforeseeable and thus may break the chain of causation.[13]

## IV.   CONCLUSION

The legislature has acted and required police officers to serve antiharassment orders as the default means of service. We have long recognized that where a municipal entity owes a duty to specific individuals, it must not discharge this duty negligently. The deterrence of unreasonable behavior through tort liability is, after all, one of the guiding principles of the abolition of sovereign immunity. *King v.*

---

[12]Again, this argument essentially concedes the applicability of the legislative intent exception to the public duty doctrine.

[13]The City does not appeal the jury's determinations that Hensing acted unreasonably and that his unreasonable actions resulted in Roznowski's death.

*City of Seattle*, 84 Wn.2d 239, 244, 525 P.2d 228 (1974), *overruled on other grounds by City of Seattle v. Blume*, 134 Wn.2d 243, 947 P.2d 223 (1997).

The City had a duty to act here, and this duty required the City to act in a reasonable manner. Hensing knew or should have known that Roznowski and Kim were both present and that his service of the antiharassment order might trigger Kim to act violently. Given this knowledge or constructive knowledge and Kim's proximity to Roznowski when Hensing served Kim, Hensing's duty to act reasonably required him to take steps to guard Roznowski against Kim's criminal acts. Because we find the City owed Roznowski both a duty to act and a duty to act reasonably, we affirm the trial court's decision to deny the City's CR 56(c) and CR 50(a) motions. However, we affirm on different grounds than those relied upon by the Court of Appeals because we hold that the City did not waive review of the denial of its CR 50(a) motion by failing to renew the motion under CR 50(b) after the jury returned its verdict.

Fairhurst, J.

WE CONCUR:

Madsen, C.J.

Stephens, J.

Wiggins, J.

González, J.