IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | |
|---|---|
| TAYLOR HUBBARD, individually, and KIRSTEN HAWNEY, individually,<br><br>Appellants,<br><br>v.<br><br>CITY OF EVERETT, a political subdivision of the State of Washington,<br><br>Respondent. | No. 88354-2-I<br><br><br><br>UNPUBLISHED OPINION |

BOWMAN, A.C.J. — In 2016, Neil Roberson registered as a level III sex offender in Everett. In 2017, he moved to Mount Vernon and did not register. He later raped 13-year-old Taylor Hubbard in Skagit County, and a jury convicted him. In 2024, Hubbard and her mother, Kirsten Hawney[1] (collectively plaintiffs), sued the city of Everett (City) for negligence under several theories of liability. The trial court granted the City's CR 12(b)(6) motion to dismiss the lawsuit, and the plaintiffs appeal. Because the City owed them no legal duty, we affirm dismissal of the plaintiffs' complaint with prejudice and award the City costs.

FACTS

On September 13, 2012, Roberson pleaded guilty to indecent exposure with sexual motivation for exposing himself and masturbating in a car next to a

---

[1] We note there are multiple spellings of Hawney's first name throughout the record and briefing. We use her first name as it appears in the complaint.

school bus with children on it.[2] On October 31, the trial court sentenced him to 55 months' imprisonment and 5 months of community custody. As a condition of Roberson's community custody, the court ordered him to "[r]egister as a sex offender with the county of [his] residence." The court also ordered that if Roberson changed his residence to a different county, he "must register with the sheriff of the new county within 3 business days of moving" and provide written notice of the change of address to the sheriff of the county where he last registered.

On June 9, 2016, Roberson completed his prison sentence and moved to Everett, where he registered as a level III sex offender. Everett Police Department Detective Michael Atwood was responsible for verifying Roberson's residency every three months under RCW 9A.44.135 and RCW 36.28A.230(1)(a)(iii). The Washington Association of Sheriffs and Police Chiefs (WASPC) model policy recommends that those contacts occur "face-to-face."[3]

Between June 9, 2016, and July 19, 2018, Detective Atwood logged 22 entries in Roberson's "Verification History Report" (VHR), documenting whether he was able to verify Roberson's residency. The VHR shows that after February 8, 2017, Detective Atwood made no face-to-face residency verifications with

---

[2] Roberson had been convicted of first degree child molestation in 2002 and failure to register as a sex offender in 2003 and 2007.

[3] WASPC granted funds to Snohomish County to verify the address and residency of registered sex offenders (RSOs) and kidnapping offenders. The City entered an interlocal agreement with Snohomish County for the receipt of those funds and agreed to follow certain address and residency verification requirements.

Roberson. And in an August 17, 2017, VHR entry, Detective Atwood noted that "per roommate," Roberson "may be moving to M[oun]t Vernon soon."

As early as April 2017, Roberson moved to Mount Vernon and lived with Rebecca McKee. He did not register there as a sex offender. McKee's daughter was very close friends with Hubbard, who regularly spent the night at the McKee residence and often interacted with Roberson. Around August 1, 2018, Roberson raped 13-year-old Hubbard at the McKee residence.[4] On August 2, the Mount Vernon Police Department arrested Roberson.

On August 7, 2018, a lieutenant with the Mount Vernon Police Department informed the Everett Police Department that he was investigating a sex offense by Roberson. The e-mail stated, in relevant part:

> Our case involves potential molestation and rape of a child, and may include numerous victims. It appears [Roberson has] been living in Mount Vernon for possibly 12-18 months, without our knowledge, so we were not conducting any RSO checks. The attached information shows your RSO check history on Roberson, since his last registered address is within the Everett city limits. The last check on 7/22/18, apparently was confirmed by another resident - not personal contact with Roberson. Unfortunately, Roberson either convinced his former roommates to vouch for his residency, or he found a loophole in the check process.

On November 10, 2022, a jury convicted Roberson of two counts of second degree rape of a child, indecent exposure with sexual motivation, third degree child molestation, voyeurism, tampering with a witness, and second degree dealing in depictions of a minor engaged in sexually explicit conduct. The trial court sentenced Roberson to over 45 years' imprisonment.

---

[4] In the months before, Roberson sexually assaulted Hubbard at least two times.

On August 30, 2024, the plaintiffs sued the City for negligence under several theories of liability.[5]  The City moved to dismiss under CR 12(b)(6), arguing that the plaintiffs failed to state an actionable claim because the City owed them no duty.[6]  The plaintiffs opposed the motion to dismiss.

On February 4, 2025, the trial court held a hearing on the City's motion to dismiss and determined that the City owed no duty to the plaintiffs.[7]  The trial court granted the City's motion to dismiss the claims with prejudice and without leave to amend their complaint.

The plaintiffs appeal.[8]

ANALYSIS

The plaintiffs argue the trial court erred by dismissing their complaint for lack of duty.[9]  They assert the City owed them a "take charge" duty, a duty under *Restatement (Second) of Torts* §§ 281 and 302B (AM. L. INST. 1965), and an implied statutory cause of action under RCW 9A.44.135 and RCW 36.28A.230.[10]  We disagree.

---

[5] The plaintiffs first sued the City on February 15, 2023, alleging similar facts and causes of action.  They voluntarily dismissed that complaint three weeks later on March 8.

[6] The City also argued that the public duty doctrine barred the plaintiffs' claims and that Hawney's claims were time barred under the statute of limitations.

[7] The court ruled that "[r]egardless of whether we characterize this as the public duty doctrine or general negligence, plaintiffs fail to establish an actionable duty."  It also determined that the statute of limitations barred Hawney's claims.

[8] On February 26, 2025, the plaintiffs appealed to the Washington Supreme Court.  On July 1, 2025, the Supreme Court transferred their case to this court.

[9] The plaintiffs also argue the trial court erred by determining that the public duty doctrine applies and that Hawney's claims are time barred under the statute of limitations.

[10] Amicus Curiae Washington State Association of Municipal Attorneys filed a brief, arguing the City had no duty to the plaintiffs.

We review de novo an order granting a motion to dismiss under CR 12(b)(6). *Jackson v. Quality Loan Serv. Corp. of Wash.*, 186 Wn. App. 838, 843, 347 P.3d 487 (2015). We presume all facts alleged in the complaint are true and may consider hypothetical facts supporting the plaintiff's claims. *Kinney v. Cook*, 159 Wn.2d 837, 842, 154 P.3d 206 (2007). Dismissal is warranted only if the court concludes beyond a reasonable doubt that the plaintiff cannot prove any set of facts justifying recovery. *Id.*

To prevail on a negligence claim, a plaintiff must show (1) the existence of a duty to the plaintiff, (2) a breach of that duty, (3) a resulting injury, and (4) that the breach was the proximate cause of the injury. *N.L. v. Bethel Sch. Dist.*, 186 Wn.2d 422, 429, 378 P.3d 162 (2016). Here, the only element at issue is whether the City owed the plaintiffs a legal duty.

1.  Take Charge Duty

The plaintiffs argue the City owed Hubbard a take charge duty "to provide for [her] safety from sexual assault by Roberson" under *Restatement (Second) of Torts* §§ 315(a) and 319. The City argues the plaintiffs "fail to allege the requisite relationship or control" required to impose that duty. We agree with the City.

Generally, there is no duty to control the conduct of a third person to prevent him from causing physical harm to another. RESTATEMENT (SECOND) OF TORTS § 315. But there is an exception under *Restatement (Second) of Torts* § 315(a) when "a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct." A duty will be imposed only where there is a " 'definite, established and continuing

relationship between the defendant and the third party.' " *Taggart v. State*, 118 Wn.2d 195, 219, 822 P.2d 243 (1992) (quoting *Honcoop v. State*, 111 Wn.2d 182, 193, 759 P.2d 1188 (1988)).

One special relationship giving rise to a duty is a "take charge relationship." *Binschus v. State*, 186 Wn.2d 573, 578, 380 P.3d 468 (2016). *Restatement (Second) of Torts* § 319 (§ 319) explains that

> [o]ne who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm.

Our Supreme Court has said that a public entity has a take charge duty to control parolees, mental patients, and others "it has authority to control, to the extent it has authority to control them." *Osborn v. Mason County*, 157 Wn.2d 18, 24, 134 P.3d 197 (2006).

The seminal case on the take charge special relationship is *Taggart*. In that case, two parolees committed two separate assaults. *Taggart*, 118 Wn.2d at 198. The victims sued the state for the parole officers' negligent supervision of the parolees. *Id.* Our Supreme Court consolidated the cases on direct review to determine, among other things, whether the parole officers had a take charge relationship with their parolees under § 319 and "a duty to take reasonable precautions to protect anyone foreseeably endangered by [the parolees'] dangerous propensities." *Id.* at 198, 217-19, 224.

The Supreme Court held that the parole officers had a take charge relationship based on their level of control over the parolees. *Taggart*, 118 Wn.2d at 219-20. The court reasoned that the state can regulate parolees'

movements within the state, require parolees to report to a parole officer, and impose special conditions like not consuming alcohol. *Id.* at 220. It said that a parole officer is "the person through whom the [s]tate ensures that the parolee obeys the terms of his or her parole." *Id.* And it recognized that parole officers have statutory authority to supervise parolees, should know about their parolees' criminal history, and should monitor their progress. *Id.* at 219-20.

Still, the Supreme Court has emphasized that "the take charge duty is not without limitation." *Binschus*, 186 Wn.2d at 579. In *Osborn*, for example, the court held that a detective had no take charge relationship with an RSO. 157 Wn.2d at 21, 25. In that case, a detective "handled sex offender registration and community notification" and said he would post flyers notifying the community about RSO Joseph Rosenow's presence. *Id.* at 20-21. After he failed to do so and Rosenow raped and murdered a woman, the woman's parents sued the county for its failure to warn them about Rosenow. *Id.* at 20-21. Our Supreme Court determined that the detective's community notification responsibilities did not amount to control over Rosenow. *See id.* at 21, 25. And it held that the detective had no take charge duty to Rosenow's victim because the county "had no authority to control" Rosenow. *Id.* at 24-25.

Here, Detective Atwood had no control over Roberson that created a take charge special relationship. Detective Atwood was responsible for conducting Roberson's residency verifications every three months. *See* RCW 36.28A.230(1)(a)(iii). Under RCW 9A.44.135(1), he needed to "make reasonable attempts to verify that" Roberson was "residing at the registered address." And

under RCW 9A.44.135(2), if he could not locate Roberson at the registered address, he needed to "make reasonable attempts" to locate him. But that was the extent of Detective Atwood's role. Unlike the parole officers in *Taggart*, Detective Atwood could not control Roberson's movements within the state, impose conditions, supervise him, or monitor his community custody progress.[11] *See* 118 Wn.2d at 219-20. The facts here are more like those in *Osborn*. Like the detective there, Detective Atwood had no authority to control Roberson. *See Osborn*, 157 Wn.2d at 24-25. Detective Atwood's responsibility to verify Roberson's residency does not create a special relationship that gives rise to a take charge duty.

The plaintiffs assert that *Osborn* is not instructive because it preceded the WASPC grant program, which made residency verification "more stringent" under RCW 36.28A.230. We disagree. RCW 36.28A.230 provides guidelines for the RSO address and residency verification grant program. It details how often police must verify an offender's address and residency and instructs them to collect data and submit annual reports about the program's efficacy. RCW 36.28A.230(1). But it does not grant the police any additional control over RSOs.[12] *See id.*

---

[11] As evidence of the City's control, the plaintiffs argue that Detective Atwood could arrest and seek charges for Roberson's "failure to properly register in moving to Mount Vernon." But Detective Atwood's general arrest authority is not evidence of specific control over Roberson that would support a take charge duty. Indeed, every law enforcement officer can arrest people for suspected crimes and refer the case for prosecution.

[12] The plaintiffs also point to the WASPC model policy. But again, the model policy provides guidelines for monitoring RSOs and notifying the community. It does not give police officers legal authority to control RSOs.

We conclude that the City had no take charge duty.

2. Duty under *Restatement (Second)* §§ 281 and 302B

The plaintiffs also contend that a duty arose under *Restatement (Second) of Torts* §§ 281 and 302B when the City "fail[ed] to keep tabs on [Roberson]" and increased the risk "to any young women with whom Roberson interacted that he might assault them." The City argues it had no duty because "the City neither interacted with [p]laintiffs nor affirmatively created or enhanced the risk that caused their injuries." We agree with the City.

Under *Restatement (Second) of Torts* § 281 (§ 281), "[a]ctors have a duty to exercise reasonable care to avoid the foreseeable consequences of their acts." *Washburn v. City of Fed. Way*, 178 Wn.2d 732, 757, 310 P.3d 1275 (2013). Criminal conduct is generally unforeseeable, but not always. *Id.* Recognizing this, we adopted *Restatement (Second) of Torts* § 302B (§ 302B), "which provides that in limited circumstances, an actor's duty to act reasonably includes a duty to take steps to guard another against the criminal conduct of a third party." *Id.*

Section 302B provides:

> An act or an omission may be negligent if the actor realizes or should realize that it involves an unreasonable risk of harm to another through the conduct of the other or a third person which is intended to cause harm, even though such conduct is criminal.

Comment e to § 302B adds that there is a duty to protect against a third party's criminal acts in situations "where the actor's own affirmative act has created or exposed the other to a recognizable high degree of risk of harm through such misconduct." Our Supreme Court has said that a duty under this language arises

9

"only where the actor's conduct constitutes misfeasance." *Robb v. City of Seattle*, 176 Wn.2d 427, 439, 295 P.3d 212 (2013). "Mere nonfeasance is insufficient to impose a duty on law enforcement to protect others from the criminal actions of third parties." *Id.*

Here, the plaintiffs point to *Washburn* in support of their argument that the City had a duty under § 281. But their reliance is misplaced. In *Washburn*, a police officer served an antiharassment order on a woman's partner at her request. 178 Wn.2d at 739-40. The woman told the police that they needed to bring a Korean interpreter and that her partner would likely react violently to service of the order. *Id.* When the officer served the antiharassment order, he did not bring an interpreter, saw the woman inside the home with her partner, did not ask about her safety, handed her partner the order, and left. *Id.* at 740. The woman was left to explain to her partner that she had restrained him from contacting her and that he needed to vacate the home. *Id.* The partner stabbed and killed the woman later that day. *Id.*

The woman's daughters sued the city, alleging several theories of negligence. *Washburn*, 178 Wn.2d at 740. A jury returned a verdict for the woman's daughters. *Id.* at 744. The city appealed, arguing it owed the woman no legal duty, and we affirmed the jury's verdict. *Id.* On discretionary review, our Supreme Court confirmed that the city owed the woman a duty under § 281 and § 302B to guard against the danger she faced from her partner because the officer's actions "created that danger." *Id.* at 746, 757, 762. It reasoned that the officer serving the antiharassment order knew, or should have known, about the

10

woman's presence at the home, the partner's danger, and the need for an interpreter. *Id.* at 759-60. As a result, when he served the order and walked away, he "created a new and very real risk" to the woman's safety. *Id.* at 760. The court held that this was a case of misfeasance and that the city had a duty under § 302B to act reasonably to prevent foreseeable criminal conduct. *Id.* at 760-62.

But, unlike *Washburn*, this is not a case of misfeasance. The plaintiffs do not allege that Detective Atwood took any affirmative acts that created or increased the harm to them. Instead, they assert that Detective Atwood "utterly failed to complete the requisite face-to-face contacts with Roberson." And when he learned Roberson might move to Mount Vernon, Detective Atwood "simply document[ed] and ignore[d] this information and declined to take any subsequent course of action." The plaintiffs also complain that Detective Atwood did not "enforce registration requirements," "investigate Roberson's failure to register," or "arrest and incarcerate [him] . . . and protect minors in the community." Essentially, the plaintiffs contend that Detective Atwood needed to do something more. But a party's nonfeasance is insufficient to impose a duty to protect others from the criminal acts of third parties. *Robb*, 176 Wn.2d at 439. And the plaintiffs' argument that Detective Atwood's inaction amounts to misfeasance is unconvincing.

The City had no duty to the plaintiffs under § 281 and § 302B.

11

3.  Implied Cause of Action

Finally, the plaintiffs argue they have an implied cause of action under RCW 9A.44.135 and RCW 36.28A.230.  We disagree.

"Where appropriate, a cause of action may be implied from a statutory provision when the legislature creates a right or obligation without a corresponding remedy."  *Ducote v. Dep't of Soc. & Health Servs.*, 167 Wn.2d 697, 703, 222 P.3d 785 (2009).  Washington courts use a three-part test to determine whether an implied cause of action exists.  *See Bennett v. Hardy*, 113 Wn.2d 912, 920-21, 784 P.2d 1258 (1990).  We must determine

> first, whether the plaintiff is within the class for whose "especial" benefit the statute was enacted; second, whether legislative intent, explicitly or implicitly, supports creating or denying a remedy; and third, whether implying a remedy is consistent with the underlying purpose of the legislation.

*Id.* (citing *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 823 F.2d 1349, 1353 (9th Cir. 1987)).

The first *Bennett* factor requires a plaintiff to establish that "they fall within the class of persons intended to be protected by [a] statute."  *Fisk v. City of Kirkland*, 164 Wn.2d 891, 895, 194 P.3d 984 (2008).  We look to the language of the statute to determine whether the plaintiff is a member of the protected class. *Swank v. Valley Christian Sch.*, 188 Wn.2d 663, 676, 398 P.3d 1108 (2017).  If the statute "serves the general public welfare instead of an identifiable class of persons, then there is no duty to any individual unless a specific exception applies."  *Fisk*, 164 Wn.2d at 895.

Here, the plaintiffs identify no specific class of persons that the statutes are intended to protect.[13] RCW 36.28A.230 states only that the purpose of the WASPC grant program is to "verify[ ] the address and residency of sex offenders and kidnapping offenders registered under RCW 9A.44.130 who reside within the county sheriff's jurisdiction." And, as discussed, RCW 9A.44.135 outlines law enforcement's responsibilities for verifying an RSO's address. But neither RCW 9A.44.135 nor RCW 36.28A.230 references any specific class that the statute is meant to protect. Instead, the statutes serve the public welfare at large. So, the first *Bennett* factor does not support finding an implied cause of action.

The second *Bennett* factor requires us to consider whether the legislature intended to grant a right of recovery for statutory violations. *Swank*, 188 Wn.2d at 677. The plaintiffs' argument is only that the legislature "conferred limited liability on government officials and agencies" in RCW 4.24.550(7), which is evidence that the legislature "fully understood that civil liability would follow from violations of RCW 9A.44.135 [and] RCW 36.28A.[2]30." But RCW 4.24.550 is about classifying a sex offender's risk level and releasing their information to the public. And it explicitly limits certain public employees' liability for their "discretionary risk level classification decisions or release of relevant and necessary information." RCW 4.24.550(7).

---

[13] The plaintiffs seem to abandon their argument below that the statutes were explicitly enacted to benefit children. They argue in only their reply brief that "[i]t is common sense that sex offender laws exist to protect the most vulnerable members of our society, most importantly children."

While a grant of immunity may be evidence of legislative intent to create a remedy,[14] RCW 4.24.550 falls under a different statutory title (civil procedure) than the statutes at issue here and is unrelated to sex offender address verification. Indeed, the legislature could have provided the same immunity for acts under RCW 9A.44.135 and RCW 36.28A.230 if it intended for liability to attach, but it chose not to. *See Perez-Crisantos v. State Farm Fire and Cas. Co.*, 187 Wn.2d 669, 680, 389 P.3d 476 (2017) ("[W]here the legislature includes particular language in one section of a statute but omits it in another, the exclusion is presumed intentional."). The second *Bennett* factor does not support finding an implied cause of action.

The third factor of the *Bennett* test requires us to consider if implying a cause of action is consistent with the purpose of the statutes. *Swank*, 188 Wn.2d at 679. But the plaintiffs fail to analyze this factor. While they cite several cases finding implied causes of action, they do not explain how those cases apply to the purposes of the statutes here. So, the plaintiffs fail to show that RCW 9A.44.135 and RCW 36.28A.230 imply a cause of action.

In sum, the trial court did not err by concluding the City owed no duty to the plaintiffs and granting its CR 12(b)(6) motion to dismiss the negligence lawsuit with prejudice.[15]

---

[14] *See Swank*, 188 Wn.2d at 678 (recognizing that a grant of immunity can be evidence of the legislature's intent to imply a cause of action).

[15] Because we determine the City had no duty and affirm the trial court's dismissal with prejudice, we need not address the public duty doctrine or plaintiffs' argument that the trial court erred by determining that Hawney's claims are time barred under the statute of limitations.

## 4. Appellate Costs

The plaintiffs and the City request costs under RAP 14.2. Under RAP 14.2, we "will award costs to the party that substantially prevails on review." Because the City is the prevailing party, we grant its request.

We affirm the trial court's dismissal with prejudice and award the City its appellate costs under RAP 14.2.

_____, ACJ

WE CONCUR:

_____  _____