# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| THE PORT OF LONGVIEW, a Washington municipal corporation | No. 46654-6-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| ARROWOOD INDEMNITY COMPANY; MARINE INDEMNITY INSURANCE COMPANY OF AMERICA; | |
| Defendants, | |
| and | |
| ASSICURAZIONI GENERALI S.P.A.; BALOISE INSURANCE COMPANY, LTD.; BISHOPSGATE INSURANCE COMPANY, LTD.; COMMERCIAL UNION ASSURANCE COMPANY, P.L.C.; CONTINENTAL ASSURANCE OF LONDON, LTD.; DRAKE INSURANCE COMPANY LTD.; ECONOMIC INSURANCE COMPANY; EDINBURGH ASSURANCE COMPANY, LTD.; ELDERS INSURANCE COMPANY, LTD.; EXCESS INSURANCE COMPANY, LTD.; FUJI FIRE AND MARINE INSURANCE COMPANY (U.K.) LTD.; HANSA MARINE INSURANCE COMPANY (U.K.) LTD.; INDEMNITY MARINE ASSURANCE COMPANY, LTD.; INTERESTED UNDERWRITERS AT LLOYD'S, LONDON; LA REUNION FRANCAISE S.A. d'ASSURANCES ET DES | |

REASSURANCES; LONDON & OVERSEAS INSURANCE COMPANY, LTD.; NIPPON FIRE & MARINE INSURANCE COMPANY (UK) LTD.; NIPPON FIRE AND MARINE INSURANCE COMPANY U.K.W. LTD.; NORTHERN ASSURANCE COMPANY LTD.; NORTHERN MARITIME INSURANCE COMPANY, LTD.; OCEAN MARINE INSURANCE COMPANY, LTD.; ORION INSURANCE COMPANY LTD.; PEARL ASSURANCE P.L.C.; PHOENIX ASSURANCE COMPANY LTD.; PROVINCIAL INSURANCE COMPANY, LTD.; PRUDENTIAL ASSURANCE COMPANY, LTD.; RIVER THAMES INSURANCE COMPANY, LTD.; SCOTTISH LION INSURANCE COMPANY, LTD.; SKANDIA U.K. INSURANCE PLC; SPHERE INSURANCE COMPANY LTD.; SWITZERLAND GENERAL INSURANCE COMPANY (LONDON) LTD.; THREADNEEDLE INSURANCE COMPANY, LTD.; VESTA (U.K.) INSURANCE COMPANY LTD.; WURTTEMBERGISCHE FEUERVERSICHERUNG A.G.A.W. A/C; YASUDA FIRE & MARINE INSURANCE COMPANY (UK) LTD.,

Appellants.

MAXA, J. – The Port of Longview filed an insurance coverage action against certain London market insurers (LMI)[1] that issued several primary and excess liability insurance policies to the Port between 1977 and 1985.[2] The Port sought a declaration that LMI had an obligation to

---

[1] "LMI" is a collective descriptor for certain interested underwriters at Lloyd's, London and certain interested London market insurance companies.

[2] The Port also filed suit against Arrowood Indemnity Company and other insurers. All insurers other than LMI were dismissed before trial.

provide coverage under its policies for groundwater contamination at two different sites on Port property: the TWP (treated wood products) site and the TPH (total petroleum hydrocarbon) site.

A mistrial occurred in the first trial when the Port found undisclosed documents. After the second trial, the jury entered a special verdict finding that (1) LMI did not prove that it suffered actual and substantial prejudice resulting from the Port's late notice to LMI of its insurance claims (relating to the prompt notice provisions in the primary policies), (2) the Port proved that it did not expect or intend groundwater contamination at either the TWP site or the TPH site before issuance of any of the LMI primary and excess policies (relating to the "occurrence" requirement in the policies), and (3) the Port proved that it did not expect or intend the release of contamination to groundwater before issuance of any of the LMI excess policies (relating to the exception to the qualified pollution exclusion in the excess policies). Based on the special verdict and multiple pretrial rulings, the trial court entered declaratory judgment orders ruling that LMI was obligated under its primary policies to defend and indemnify the Port and under its excess policies to indemnify the Port against all claims arising out of liability at the TWP and TPH sites. The trial court later awarded attorney fees to the Port under *Olympic Steamship*.[3]

LMI appeals certain trial court rulings, arguing that the trial court erred by (1) imposing sanctions against LMI for delayed discovery responses and denying its motion to vacate the sanctions after the mistrial; (2) making three rulings regarding late notice prejudice: denying its summary judgment motions on late notice prejudice for the TWP and TPH sites, improperly limiting the evidence it could present at trial on late notice prejudice at the TPH site, and

---

[3] *Olympic S.S. Co. v. Centennial Ins. Co.*, 117 Wn.2d 37, 811 P.2d 673 (1991).

improperly instructing the jury on late notice prejudice; (3) ruling as matter of law that the known loss principle did not preclude coverage for the TWP site; (4) denying its motions for judgment as a matter of law on the occurrence requirement because the Port did not present sufficient evidence that it did not expect or intend groundwater contamination; (5) denying its motions for judgment as a matter of law on the qualified pollution exclusion because the Port did not present sufficient evidence that it did not expect or intend the release of contaminants into the groundwater; and (6) awarding attorney fees to the Port under *Olympic Steamship* and determining the amount of the fee award.

We reject LMI's substantive arguments and hold that the trial court did not err in granting and denying the motions at issue or in entering the declaratory judgment orders. We also hold that the trial court erred in awarding attorney fees for the Port's claims under the primary policies because under established law, the Port's late notice precluded its recovery of *Olympic Steamship* attorney fees. But we hold that the Port is entitled to recover attorney fees for its excess policy claims because the Port did not breach the notice provisions in those policies. Accordingly, we affirm the trial court's declaratory judgment orders but reverse the trial court's attorney fee order and remand for the trial court to determine the amount of attorney fees that should be awarded for the Port's claims under the excess policies.

FACTS

*TWP Site*

International Paper (IP) originally owned the TWP site, which included two adjacent areas: the maintenance facility area (MFA) and the IP plant area. IP operated a wood treating plant on the IP plant area from the 1950s through 1982 using chemical preservatives, creosote

4

and pentachlorophenol. The adjacent MFA consisted of vacant land and some maintenance operations. The IP plant area contained an open ditch (referred to as the "lineament ditch") that conveyed the wood treating wastewater from the treatment area to seepage ponds, where the wastewater was contained. This lineament ditch ran across the MFA and was in use until the mid-1960s, when IP began discharging wastewater into ponds in the IP plant area. The Port purchased the MFA from IP in two transactions in 1963 and 1965, while the lineament ditch was still in use.

In 1981, the Washington Department of Ecology (DOE) sampled groundwater and discovered hazardous waste contamination in the groundwater at the IP plant area. IP worked with the DOE for several years to investigate and remediate the IP plant area. In 1997, IP entered into a consent decree with DOE in which IP agreed to assume complete responsibility for remediating the contaminated groundwater at the IP plant area.

Contaminated soil was discovered in the MFA in 1997 when IP installed an underground barrier wall around the IP plant area. Subsequent testing in 1998 revealed groundwater contamination at the MFA. DOE determined that contamination at the MFA should be investigated under the consent decree for the IP plant area.

In 1999, the Port purchased the IP plant area. Under the purchase agreement, IP remained responsible for continued investigation and remediation of the groundwater contamination. The Port was aware that it became automatically liable under the Washington Model Toxics Control Act (MTCA) for contamination at the IP plant area once it completed the purchase.

In 2005, DOE sent the Port a letter indicating the Port was a potentially liable person (PLP) under MTCA for the TWP site because it was the site's owner.[4] The letter referenced both the IP plant area and the MFA. However, by agreement IP continued to be responsible for the TWP site and to date DOE has not required the Port to conduct any investigation or remediation of the TWP site.

*TPH Site*

The TPH site is located in the Port's rail yard, and the Port leased portions of the property to various entities between 1926 and 1985. The groundwater at this site became contaminated because of petroleum hydrocarbon releases from various operations, including Standard Oil (now Chevron) pipelines and Longview Fibre pipelines, loading racks, and associated above ground storage tanks. Contamination also occurred because of leaking from a small underground storage tank on property leased to Calloway Ross, a construction company.

The Port discovered the groundwater contamination at the TPH site in 1991, when it removed the Calloway Ross underground storage tank and noticed a small hole in the tank. The Port then conducted wider testing and discovered more extensive groundwater contamination at the TPH site beyond the Calloway Ross area, which likely came from leaking pipelines and larger storage tanks.

---

[4] Under the MTCA, all current and past owners and operators at a contaminated facility are strictly liable and jointly and severally liable for all investigation and remediation costs. RCW 70.105D.040.

The Port continued to investigate the TPH site contamination and identified those who it suspected would be PLPs under MTCA.[5] In 1998, the Port entered into a cost-sharing agreement with Chevron and Longview Fibre ("the Chevron agreement"). This agreement provided that Chevron would compensate the Port for past expenditures and would contribute 50 percent of future expenses related to investigation and remediation, up to a certain date.[6] The Port agreed to contribute 20 percent of future costs (up to certain limits) and Longview Fibre agreed to cover the remaining 30 percent. DOE has not been involved in the TPH site investigation or remediation activities and it has not designated the Port a PLP under MTCA.

*LMI Insurance Policies*

LMI issued four primary liability policies to the Port between 1979 and 1985: MC 5757, MC 5998, MC 6016, and MC 6027. Neither the Port nor LMI had complete copies of the four primary policies at issue. But the Port had broker's certificates and insuring agreements for the first three policies. The insuring agreements for these policies contained identical terms, including a coverage clause, insuring clause, and notice clause. For the fourth policy – MC 6027 – the Port did not have a broker's certificate or insuring agreement, but there was a handwritten notation on the MC 6016 broker's certificate indicating that MC 6027 had replaced MC 6016.

---

[5] PLP status extends to any person who operated the facility at the time of the release of hazardous substances. RCW 70.105D.040(1)(b).

[6] There was some uncertainty when the Chevron agreement terminated. However, the agreement apparently terminated before the trial court entered judgment and the allocation of responsibility does not apply to ongoing investigation and remediation costs.

The portions of primary policies in the Port's possession required that the Port give LMI notice "as quickly as possible" after anyone made a claim against the Port and "as soon as may be practicable" of any occurrence that is apt to be a claim. Pl.'s Ex. 107 (MC 5757), Pl.'s Ex. 44 (MC 5998), Pl.'s Ex. 46 (MC 6016). These portions of the primary policies also required that the Port's liability arise from an "occurrence." Pl.'s Ex. 107 (MC 5757), Pl.'s Ex. 44 (MC 5998), Pl.'s Ex. 46 (MC 6016). None of the portions of the primary policies in the Port's possession contained a pollution exclusion.

LMI also issued seven excess liability policies to the Port between 1977 and 1985. These policies provided coverage only after the underlying primary policies had been exhausted. The policies required the Port to give notice as soon as practicable after an occurrence that could result in liability or damages in an amount necessary to implicate the excess policies. But the policies stated that the failure to give notice of an occurrence that did not initially appear to implicate the excess policies would not prejudice such claims. All of the excess policies required that the Port's liability arise from an "occurrence." *See*, *e.g.*, Pl.'s Ex. 40 (JSL 1021). Six of the excess policies contained a qualified pollution exclusion, which excluded coverage for the discharge or release of contaminants unless the discharge or release was sudden and accidental.

*Delayed Notice of Claim to LMI*

The Port was aware of groundwater contamination at the TWP site by at least 1999 and at the TPH site by 1991. However, the Port did not give notice to LMI of any potential claims at either site. The Port stated that at those times, it was not aware that anyone would assert a claim based on groundwater contamination against the Port and it did not know that there would be

insurance coverage for such a claim. The Port also did not give notice of a claim when it received a PLP letter in 2005 from DOE for the TWP site.

In 2009, the Port unsuccessfully attempted to give formal notice to LMI of its insurance claims under the primary policies. But the first formal notice LMI received on the primary policies was when the Port filed this action. The Port provided notice to LMI on the excess policies on August 6, 2010.

*Coverage Lawsuit*

In August 2010, the Port filed suit against LMI, seeking (1) a declaratory judgment that LMI's policies provided coverage for the TWP and TPH groundwater contamination, (2) recovery of environmental response costs the Port had incurred at the TWP and TPH sites, and (3) reasonable attorney fees incurred by the Port in bringing the suit. The trial court granted the Port's motion to bifurcate the trial – Phase 1 would deal with coverage and Phase 2 would deal with damages. The Phase 1 trial was scheduled for February 2013.

*Summary Judgment Motions*

Both parties filed multiple motions for partial summary judgment on various issues. The trial court ruled as a matter of law that the Port had provided untimely notice on the TWP and TPH sites. However, the trial court denied LMI's summary judgment motion and granted the Port's summary judgment motion and ruled that late notice caused no prejudice at the TWP site. The trial court also originally ruled that late notice caused no prejudice at the TPH site except for the Port's 2008 agreement with Chevron. But after additional discovery the trial court ruled that there was a question of fact regarding prejudice at the TPH site and denied renewed summary judgment motions filed by both LMI and the Port.

9

LMI and the Port both filed summary judgment motions regarding the TWP site that addressed the Port's purchase of the IP plant area in 1999 with knowledge that the area was contaminated. LMI relied in part on the "known loss" principle of insurance coverage and the occurrence requirement in the policies. The trial court ruled that because the Port already was liable for the TWP site based on its ownership of the MFA, the Port's purchase of the IP plant area did not increase the Port's liability for the TWP site and therefore did not affect coverage for that site. As a result, the trial court granted summary judgment in favor of the Port on liability at the TWP site.

Neither party filed summary judgment motions on the occurrence requirement (other than relating to the purchase of the IP plant area) or the pollution exclusions in the excess policies.

*Discovery Sanctions Against LMI*

The Port did not possess complete copies of the LMI primary policies, but it did have broker's certificates and insuring agreements for three of the four policies. LMI disputed that the broker's certificates contained the full language of the primary policies and argued that the Port could not prove the terms of the policies.

The Port had the burden of proving the terms of coverage in the policies at issue. Therefore, the Port focused discovery efforts on obtaining information related to the language of the primary policies and how the broker's certificates related to the policy terms. The Port also sought information about which specific underwriting syndicates signed on to each policy because LMI contended that the identity of the syndicates was an essential part of the policy.

To obtain information on the primary policies and the underwriting syndicates, the Port propounded requests for documents and scheduled CR 30(b)(6) depositions. However, there were numerous delays caused by LMI that failed to meet deadlines for document production. LMI also struggled to provide CR 30(b)(6) witnesses and repeatedly rescheduled depositions.

In November 2012, the trial court ordered LMI to search for and produce certain documents relating to its policies by November 27, before the scheduled CR 30(b)(6) depositions. LMI failed to meet this deadline. The trial court deferred its ruling on sanctions but ordered that the documents be produced by December 28, shortly before the scheduled February 4, 2013 trial date. LMI failed to produce all responsive documents by that deadline, but produced those documents a week later. The trial court sanctioned LMI by ruling that the policy language in the Port's broker's certificates and insuring agreements was consistent with the actual policy terms and that LMI was precluded from arguing otherwise.

*Mistrial and Motion for Relief on Sanctions*

Trial began in February 2013, but ended in a mistrial when the Port found previously undiscovered relevant documents that, if disclosed earlier, could have affected the trial court's summary judgment decisions. The new information also necessitated additional depositions.

After the mistrial, LMI filed a CR 60(b) motion seeking relief from the trial court's discovery sanction against LMI in light of the fact that the Port now had ample time to review the documents that LMI produced shortly before the mistrial. The trial court denied LMI's motion and the sanction remained in place for the retrial.

*Second Trial*

The second trial took place in November 2013. The jury completed a special verdict form and found in favor of the Port on each issue. The jury found that (1) the Port proved the insuring language of primary policy MC 6027 by clear, cogent, and convincing evidence and LMI failed to show by clear, cogent, and convincing evidence that MC 6027 contained language excluding coverage for pollution, (2) the Port proved that it did not subjectively expect or intend groundwater contamination before each primary and excess policy period for each site, (3) the Port proved that it did not subjectively expect or intend the release of contaminants to the groundwater before each excess policy period for each site, and (4) LMI failed to prove that it suffered actual and substantial prejudice from the Port's late notice of its TPH claims.

LMI filed CR 50 motions for judgment as a matter of law on the Port's expectation of groundwater contamination at both sites, and the Port's expectation of a release of contaminants to the groundwater at both sites. The trial court denied all CR 50 motions. LMI did not file any CR 50 motions regarding late notice prejudice.

On January 8, 2014, the trial court entered an order for partial declaratory judgment in favor of the Port on LMI's primary policies. The trial court ruled that LMI was obligated under its primary policies to defend and indemnify the Port against all claims arising out of environmental liability at the TWP and TPH sites. On May 20, the trial court entered an order for partial declaratory judgment in favor of the Port on LMI's excess policies. The trial court ruled that LMI was obligated under its excess policies to indemnify the Port against all claims arising out of environmental liability at the TWP and TPH sites, subject to the Port's obligation to prove exhaustion of the primary policies.

After trial, the Port moved to voluntarily dismiss its claim for damages with prejudice. The trial court granted the motion.

The trial court entered a final judgment under CR 54(b) and certified the January 8, 2014 and May 20, 2014 orders for appeal. The trial court retained jurisdiction over the Port's request for attorney fees.

*Attorney Fee Award*

The Port subsequently requested attorney fees and litigation expenses under *Olympic Steamship*. The Port requested approximately $2.75 million in fees and expenses, which it argued represented the actual cost of litigating to establish coverage under LMI's primary and excess policies less certain categories of fees. LMI opposed any attorney fee award and also challenged certain aspects of the requested attorney fees.

The trial court granted the Port's request and awarded just under $2.54 million in attorney fees and litigation expenses. The trial court disallowed roughly $214,000 in costs requested by the Port because those expenses related to unproductive time, excessive time, excessive costs, or fees associated with the mistrial that was caused by the Port.

LMI appeals various trial court rulings and the trial court's attorney fee award.

ANALYSIS

A.    DISCOVERY VIOLATION SANCTION

LMI argues that the trial court erred both by imposing the sanction of issue preclusion for LMI's discovery violation and by failing to modify the sanction after the mistrial. We disagree.

1. Imposition of Sanctions

LMI argues that the trial court erred in imposing a sanction that prevented LMI from contradicting the terms of the broker's certificates for the primary policies. We disagree.

a. Legal Principles

CR 37 allows the trial court to impose sanctions against a party who fails to comply with a discovery order. CR 37(b)(2) states that the trial court "may make such orders in regard to the failure as are just." The rule provides a nonexhaustive list of possible sanctions, including ordering that matters at issue "shall be taken to be established for the purposes of the action" and ordering that the disobedient party is prohibited from introducing evidence to support or oppose certain claims or defenses. CR 37(b)(2)(A)-(B). The trial court generally should impose the least severe sanction that will adequately serve the purposes of sanctions, which are to compensate the harmed party, deter, punish, and educate the wrongdoer, and ensure that the wrongdoer does not profit from the wrong. *Barton v. Dep't of Transp.*, 178 Wn.2d 193, 215, 308 P.3d 597 (2013).

Before a trial court imposes one of the "harsher remedies" under CR 37(b), it must first consider the *Burnet*[7] factors on the record. *Magaña v. Hyundai Motor Am.*, 167 Wn.2d 570, 584, 220 P.3d 191 (2009). The trial court record must clearly show that (1) one party willfully or deliberately violated the discovery rules and orders, (2) the opposing party was substantially prejudiced in its ability to prepare for trial, and (3) the trial court explicitly considered whether a

---

[7] *Burnet v. Spokane Ambulance*, 131 Wn.2d 484, 494, 933 P.2d 1036 (1997).

lesser sanction would have sufficed. *Id.* The Supreme Court has recognized that the "harsher remedies" include those sanctions described in CR 37(b)(2)(A)-(B). *Mayer v. Sto Indus., Inc.*, 156 Wn.2d 677, 688, 132 P.3d 115 (2006).

We review the trial court's order of discovery sanctions for abuse of discretion. *Barton*, 178 Wn.2d at 214. The trial court has wide latitude in fashioning the appropriate sanction for discovery abuse. *Id.* at 215. "A trial court exercises broad discretion in imposing discovery sanctions under CR 26(g) or 37(b), and its determination will not be disturbed absent a clear abuse of discretion." *Mayer*, 156 Wn.2d at 684. A finding of abuse of discretion requires a clear showing that the trial court was manifestly unreasonable in exercising its discretion or exercised its discretion on untenable grounds or for untenable reasons. *Barton*, 178 Wn.2d at 215.

      b.    Sanction Analysis

The record indicates that the trial court considered the *Burnet* factors before issuing the sanction. The trial court looked to the first factor – willfulness in violating the discovery order – and determined that this factor was met because LMI failed to use a computer specialist to search the database it was ordered to search and instead had 60 people search the records by hand. A large, sophisticated company's failure to maintain and fully utilize a document retrieval system may constitute a willful violation. *See Magaña*, 167 Wn.2d at 585-86.

The trial court found that the second factor – substantial prejudice – was met because the Port received over 100 responsive documents a week after the December 28 deadline, which was significant in light of the fact that the trial was scheduled to begin a month later. The trial court stated:

> I set a deadline for December 28th. My recollection is that I indicated that it was pretty serious about that deadline. A good deal of information showed up a week later. Well, what's a week? In the context of this case, in the context of a trial date looming a month later, I think a week is pretty important.

Report of Proceedings (RP) (Feb. 4, 2013) at 74. LMI's delayed disclosure meant that the Port had little time to use the underwriting syndicate information in its trial preparation. The Port also had less time to properly prepare for its CR 30(b)(6) depositions of LMI witnesses.

Finally, the trial court considered the third factor – whether a lesser sanction would suffice – and concluded that the sanction it imposed was the least serious sanction that would address the problem. The trial court rejected a simple monetary sanction because it did not believe money "really fixes the problem." RP (Feb. 4, 2013) at 75. The trial court also considered lowering the burden of proof on the Port in proving the lost policy language, but it rejected that idea out of concern that changing the burden would confuse the jury. The trial court concluded that the only available option was to prevent LMI from contradicting the language of the broker's certificates.

The record shows that the trial court thoroughly considered the *Burnet* factors. And we give the trial court wide latitude in making the sanction determination. *Barton*, 178 Wn.2d at 215. Accordingly, we hold that the trial court did not abuse its discretion in imposing the CR 37 sanction against LMI.

2. Denial of CR 60(b) Motion for Relief

LMI argues that the trial court erred by failing to grant its CR 60(b) motion seeking relief from the discovery sanction after the mistrial.[8]  We disagree.

a. Legal Principles

We review a trial court's denial of a CR 60(b) motion for an abuse of discretion. *Union Bank, NA v. Vanderhoek Assocs., LLC*, 191 Wn. App. 836, 842, 365 P.3d 223 (2015).  A trial court abuses its discretion if it makes its decision based on untenable grounds or for untenable reasons. *Id.*

CR 60(b) provides a list of reasons that permit a court to grant relief from a final judgment or order.  CR 60(b)(11) provides a catchall provision that allows a court to relieve a party from an order for "any other reason justifying relief from the operation of the judgment." However, use of CR 60(b)(11) should be confined to situations involving " 'extraordinary circumstances, which constitute irregularities extraneous to the proceeding.' " *Union Bank*, 191 Wn. App. at 845 (internal quotation marks omitted) (quoting *In re Det. of Ward*, 125 Wn. App. 374, 379, 104 P.3d 751 (2005)).

b. Analysis

LMI argues that the trial court's only reason for imposing sanctions was that the week delay in producing documents prejudiced the Port in its preparations for the trial scheduled for a month later.  However, the trial court expressly explained that although the timing of LMI's

---

[8] In its reply brief, LMI asserts that the trial court could have granted relief under CR 60(b)(4), which allows for relief when the adverse party commits misconduct.  However, we do not consider CR 60(b)(4) because LMI did not assert that theory in the trial court.

discovery violation in relation to the impending trial date was a major factor in imposing the sanction initially, it was not the only factor.

> The pendency of the trial date was one of the factors that I had to keep in mind in determining the least severe effective sanction at the time. So does the absence of that trial date dictate a change? I think it's incumbent on me to say it wasn't the only consideration at the time I imposed that sanction. Certainly there was a lot of discussion, a lot of controversy surrounding the search of the LIDS database, the following markets, all those issues.

RP (May 22, 2013) at 156. Because the impending trial was not the trial court's only consideration in awarding sanctions, the mistrial did not automatically require that the sanctions be modified. The change in trial date did not negate what the trial court found to be LMI's willful violation and obstructive approach to discovery.

The postponement of the trial arguably reduced the Port's prejudice. If the trial court had imposed the original sanctions after the mistrial, application of the *Burnet* factors may not have supported the sanctions. But LMI does not cite any authority for – or even argue – the proposition that a trial court must apply the *Burnet* factors when considering a CR 60(b) motion to vacate a sanctions order.

Further, because LMI filed a motion to vacate the sanctions order under CR 60(b), LMI is entitled to relief only if the requirements of CR 60(b) are satisfied. The only question is whether the granting of the mistrial is an extraordinary circumstance justifying relief. The trial court found that the mistrial did not justify relief under CR 60(b), stating, "My position is that it does not justify modification of that prior order because I believed then and I believe now that that order was the minimum effective sanction in the context of all that had gone on." RP (May 22, 2013) at 157.

18

The standard of review under CR 60(b) is abuse of discretion. *Union Bank*, 191 Wn. App. at 842. Because the trial court was not required to reapply the *Burnet* factors and because the trial court noted that there were other factors supporting the discovery sanction, we hold that the trial court did not abuse its discretion by denying LMI's CR 60(b) motion for relief.

B.      PREJUDICE FROM LATE NOTICE

The Port first discovered groundwater contamination at the TPH site in 1991. The Port became aware of groundwater contamination at the MFA in 1997, and the Port purchased the IP plant area with knowledge of that area's groundwater contamination in 1999. Yet the Port did not give LMI formal notice under the primary policies of potential claims at these sites until filing suit in August 2010. The trial court ruled as a matter of law that the Port provided untimely notice for the primary policies on both the TWP and TPH sites.

LMI argues that as a matter of law the Port's late notice precludes the Port from obtaining coverage for either site under the primary policies[9] because the late notice prejudiced LMI. Therefore, LMI argues that the trial court erred in denying its summary judgment motions on late notice prejudice.[10] LMI also argues that the trial court erred in limiting the evidence that it could

_____

[9] LMI did not argue in the trial court and does not argue on appeal that the Port breached the notice provisions of the excess policies. The excess policies required the Port to provide notice only if the claim could result in liability or damages in an amount necessary to implicate the excess policies. LMI does not argue that this condition had been satisfied before the Port filed suit in 2010.

[10]  At trial, the Port moved for a judgment as a matter of law on late notice prejudice at the TPH site regarding the 1998 Chevron agreement and with respect to the Calloway Ross tank removal. But LMI did not file a CR 50(a) motion for judgment as a matter of law regarding late notice prejudice in general. Therefore, our review is limited to the trial court's denial of LMI's summary judgment motion on this issue.

present at trial on late notice prejudice and in instructing the jury that it could consider three specified types of evidence in deciding the prejudice issue.

We hold that the trial court did not err in (1) denying LMI's summary judgment motion on late notice prejudice for the TWP site, (2) denying LMI's summary judgment motion on late notice prejudice for the TPH site, (3) limiting the evidence LMI could present regarding prejudice, and (4) instructing the jury on late notice prejudice at the TPH site.

### 1. Policy Language

The primary policies contain two separate notice provisions. First, the broker's certificates provide:

> In the event of any claim being made hereunder the Assured shall give, as quickly as possible, written notice thereof together with fullest particulars possible to the undersigned.

Pl.'s Ex. 107 (MC 5757), Pl.'s Ex. 44 (MC 5998), Pl.'s Ex. 46 (MC 6016).

> Second, the insuring agreements contain specific notice of loss provisions:

> Upon being known to Assured's management, notice of the occurrence of any and all losses which are apt to be a claim under this policy shall be given Assurers by Assured as soon as may be practicable, and the said Assured shall deliver to Assurers as particular an account thereof as the nature of the case will admit stating the cause if known, the extent thereof, and the nature of the interest of the Assured.

Pl.'s Ex. 107 (MC 5757), Pl.'s Ex. 44 (MC 5998), Pl.'s Ex. 46 (MC 6016).

### 2. Legal Principles

The insured's breach of a prompt notice provision in an insurance policy does not allow an insurer to avoid its coverage obligations unless the late notice causes "actual and substantial prejudice." *Mut. of Enumclaw Ins. Co. v. USF Ins. Co.*, 164 Wn.2d 411, 426, 191 P.3d 866 (2008). And the insurer has the burden of proving actual and substantial prejudice from the late

notice. *Id*. at 427. The insurer cannot meet this burden by merely alleging prejudice – the insurer must produce affirmative proof of actual prejudice. *Canron, Inc. v. Fed. Ins. Co.*, 82 Wn. App. 480, 491, 918 P.2d 937 (1996).

To prove prejudice, the insurer must show that the insured's late notice "had an identifiable and material detrimental effect on its ability to defend its interests." *Mut. of Enumclaw*, 164 Wn.2d at 430. The insurer must present " 'affirmative proof of an advantage lost or disadvantage suffered as a result of the delay, which has an identifiable detrimental effect on the insurer's ability to evaluate or present its defenses to coverage or liability.' " *Id*. at 429 (quoting *Canron*, 82 Wn. App. at 491-92).

Such a detrimental effect may include interference with the insurer's ability to investigate the insured's liability or coverage defenses because of lost witnesses or documents or changes to the physical site. *Canron*, 82 Wn. App. at 491. In that situation, the insurer must show that "what is lost or changed must be material, and not otherwise available or subject to reasonable reconstruction." *Id.*; *see also Mut. of Enumclaw*, 164 Wn.2d at 430 (stating that when the claimed prejudice involves the ability to investigate, the insurer must show that "the kind of evidence that was lost would have been material to its defense").

The Supreme Court in *Mutual of Enumclaw* noted that Washington courts have relied on many factors when evaluating prejudice from late notice, and provided a nonexhaustive list of these factors:

> [1] Were damages concrete or nebulous?
> [2] Was there a settlement or did a neutral decision maker calculate damages; what were the circumstances surrounding the settlement?
> [3] Did a reliable entity do a thorough investigation of the incident?
> [4] Could the insurer have eliminated liability if given timely notice?
> [5] Could the insurer have proceeded differently in the litigation?

164 Wn.2d at 429-30 (citations and parentheticals omitted).

Whether late notice prejudiced an insurer is a question of fact, which "will seldom be decided as a matter of law." *Id*. at 427. Similarly, prejudice is presumed only in extreme cases. *Id*. at 428.

3.    Summary Judgment Standard

We review a trial court's order granting or denying summary judgment de novo. *Lyons v. U.S. Bank Nat'l Ass'n*, 181 Wn.2d 775, 783, 336 P.3d 1142 (2014). We review the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Lakey v. Puget Sound Energy, Inc.*, 176 Wn.2d 909, 922, 296 P.3d 860 (2013).

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). "A genuine issue of material fact exists when reasonable minds could differ on the facts controlling the outcome of the litigation." *Dowler v. Clover Park Sch. Dist.*, 172 Wn.2d 471, 484, 258 P.3d 676 (2011). If reasonable minds can reach only one conclusion on an issue of fact, that issue may be determined on summary judgment. *Failla v. FixtureOne Corp.*, 181 Wn.2d 642, 649, 336 P.3d 1112 (2014), *cert. denied*, 135 S. Ct. 1904 (2015).

The moving party bears the initial burden of showing that there is no genuine issue of material fact. *Lee v. Metro Parks Tacoma*, 183 Wn. App. 961, 964, 335 P.3d 1014 (2014). A moving defendant can meet this burden by showing that there is an absence of evidence to support the plaintiff's case. *Id.* The burden then shifts to the plaintiff to come forward with sufficient evidence to establish the existence of each element of the plaintiff's case. *Id.* If the plaintiff does not submit such evidence, summary judgment is appropriate. *Id.*

4.    Late Notice Prejudice for TWP Site

LMI argues that the trial court erred in denying its summary judgment motion on late notice prejudice at the TWP site.[11]  We disagree.

In the trial court, LMI's initial summary judgment motion on late notice prejudice focused almost exclusively on the TPH site.  LMI's motion contained only one paragraph regarding prejudice for the TWP site.

LMI now argues that the Port's late notice caused prejudice for the TWP site because (1) LMI was unable to investigate DOE's allegations and assert defenses that could have mitigated the Port's liability when the Port received its PLP letter from DOE in 2005, and (2) witnesses with knowledge regarding the Port's expectation of polluting events and groundwater contamination in the 1960s and 1970s had died before LMI received notice.  The second argument refers to Bob McNannay, the Port general manager from 1974 to 1986, and Bob Foster, the Port director of engineering from sometime before 1980 to 1991.  Both died in the early 2000s, before the Port gave LMI notice.

Regarding the first argument, LMI fails to explain why late notice has prevented it from asserting defenses to the Port's liability under MTCA.  DOE identified the Port as a PLP, but that is merely a preliminary designation – *potentially* liable person.  Nothing in the record indicates that the Port entered into a consent decree with DOE or that DOE obtained an adjudication of the Port's liability before LMI received notice.  As a result, LMI currently remains able to assert all MTCA defenses on the Port's behalf despite the late notice.

---

[11] In addition to denying LMI's summary judgment motion on the TWP site, the trial court also granted summary judgment in favor of the Port on that site.  LMI does not assign error to that summary judgment order.

Further, in the trial court the only MTCA defense LMI suggested had been lost was the so-called "plume defense" now codified at RCW 70.105D.020(22)(iv).[12] But the trial court ruled as a matter of law on a different motion that the Port did not meet the requirements of the plume defense for the TWP site. LMI did not appeal that ruling.

Regarding the second argument, the fact that certain witnesses are deceased is not sufficient to create a question of fact regarding prejudice because LMI failed to allege what evidence could have been produced by those witnesses. When asserting prejudice based on lost witnesses, the insurer must show what information the lost witnesses possessed and that the information was material. *Canron*, 82 Wn. App. at 489, 491. "It is not sufficient merely to allege prejudice; an insurer must demonstrate specifics." *Id.* at 491. In the trial court, LMI did not allege what testimony McNannay and Foster would have given, other than to say that they possessed "pertinent knowledge." Clerk's Papers (CP) at 7759. LMI did not produce any evidence that McNannay and Foster would have supported a defense to coverage or would have assisted in the investigation and defense of DOE's MTCA claim.

The fact that McNannay and Foster could have had knowledge about the Port's expectation of groundwater contamination might show *potential* prejudice. But in order avoid summary judgment, LMI was required to come forward with some evidence of *actual* prejudice. *Mut. of Enumclaw*, 164 Wn.2d at 426.

---

[12] On appeal, LMI argues for the first time that it also could have asserted the third party defense under RCW 70.105D.040(3)(a)(iii) on behalf of the Port in any action pursued by DOE. Because LMI did not argue that before the trial court, we do not consider whether LMI's inability to argue the third party defense caused actual and substantial prejudice. In any event, as discussed above nothing prevents LMI from raising that defense in any DOE action.

In any event, even if the deaths of McNannay and Foster were enough to create an inference of actual prejudice, at best that inference would create a question of fact regarding prejudice. Without more specific information about what these witnesses knew, the fact that they are unavailable could not establish prejudice as a matter of law. Because LMI is appealing only the denial of its summary judgment motion, a question of fact means that LMI was not entitled to summary judgment.

We hold that the trial court did not err in denying LMI's summary judgment motion on late notice prejudice for the TWP site.

5.    Late Notice Prejudice for TPH Site

The trial court denied LMI's motions for summary judgment on late notice prejudice at the TPH site on September 11, 2012, December 21, 2012, and November 5, 2013. In its November 5 order, the trial court ruled that there were material issues of fact regarding late notice prejudice at the TPH site. LMI argues that the trial court erred in denying its pretrial motions for summary judgment on late notice prejudice at the TPH site. We disagree.

a.    Review of Pretrial Denial of Summary Judgment

We cannot review the trial court's pretrial denial of summary judgment if the denial was based on the presence of material, disputed facts and there has been a subsequent trial on the merits. *Weiss v. Lonnquist*, 173 Wn. App. 344, 354, 293 P.3d 1264 (2013). The proper procedure for reasserting at trial the issues raised in the previously denied summary judgment motion is a motion for judgment as a matter of law under CR 50(a) and/or CR 50(b).

Here, LMI lists a number of consequences of the Port's late notice for the TPH site: (1) the Calloway Ross underground storage tank and two other tanks were removed and destroyed, (2) key witnesses have died or have faded memories, (3) the Port assumed partial responsibility for contamination and made voluntary payments, (4) the Port did not file suit against other polluters like Calloway Ross, and (6) the Port foreclosed any opportunity to seek contribution under MTCA.

LMI also discusses what it could have done differently if it had received prompt notice: (1) properly investigated and made an informed decision regarding its obligation to provide coverage, (2) considered whether it needed to retain an expert to address missing information and conduct interviews, (3) conducted its own soil and groundwater sampling and undertaken its own evaluation of the pollution, (4) mitigated the Port's liability and expenses, (5) prevented the Port from entering into prejudicial cost sharing agreements; and (6) pursued other PLPs who caused or contributed to the contamination while evidence was still available.

LMI argues that all these factors establish prejudice. However, as noted above, whether an insurer can prove prejudice generally is a question of fact. *Mut. of Enumclaw*, 164 Wn.2d at 427. All of these factors necessarily involve the resolution of factual issues and the trial court denied LMI's summary judgment motion on late notice prejudice at the TPH site based on the existence of questions of fact. As a result, we decline to review the trial court's pretrial denial of summary judgment that involved consideration of these factors.

When a pretrial denial of summary judgment is based on a question of law, we can review that order even after a trial on the merits. *Weiss*, 173 Wn. App. at 354. LMI argues that although the trial court found factual issues regarding late notice prejudice, that finding was

based on two errors of law: (1) the conclusion that prejudice can be based only on a lost ability to investigate the sites and (2) the failure to apply the *Mutual of Enumclaw* standard for determining prejudice. However, any denial of summary judgment based on the type of evidence that can be presented to prove prejudice and the application of Washington law to the facts of this case still involves the application of facts. Therefore, we decline to review these issues as well.

        b.    Presumed Prejudice

LMI also argues that the trial court should have granted its pretrial summary judgment motions by finding prejudice as a matter of law based solely on the length of the Port's delay in giving notice. A failure to grant a pretrial summary judgment motion based on a legal issue is reviewable following trial. *Weiss*, 173 Wn. App. at 354. LMI essentially argues that we should presume prejudice even if there are factual issues as to whether LMI sustained actual and substantial prejudice. We disagree.

The parties debate when the Port was required to give notice of potential claims at the TWP and TPH sites. But there is no question that the delay was substantial. The Port certainly knew when it entered into the Chevron agreement in 1998 that it had liability for costs incurred at the TPH site. And the Port knew when it purchased the IP plant area in 1999 that it was now liable for contamination at the TWP site. But the Port did not give LMI notice of these claims until 2010. The question is whether such a significant delay in giving notice for environmental claims should constitute prejudice as a matter of law even if the insurer cannot prove actual prejudice.

Washington courts repeatedly have emphasized in the late notice context that prejudice will be presumed only in extreme cases. *Mut. of Enumclaw*, 164 Wn.2d at 428; *Pub. Util. Dist. No. 1 of Klickitat County v. Int'l Ins. Co.*, 124 Wn.2d 789, 805, 881 P.2d 1020 (1994) [hereinafter *Klickitat*]; *Pederson's Fryer Farms, Inc. v. Transamerica Ins. Co.*, 83 Wn. App. 432, 438, 922 P.2d 126 (1996); *Canron*, 82 Wn. App. at 490. In *Mutual of Enumclaw*, the Supreme Court did not presume prejudice even though the insurer did not receive notice of a claim against its insured until four years after a complaint was filed and after the insured had settled with other insurers. 164 Wn.2d at 431. In *Pederson's*, this court did not presume prejudice even though the insured did not give notice to its insurer of a pollution claim until after the contaminated soil and groundwater had been cleaned up. 83 Wn. App. at 436, 441-43.

No Washington appellate court has presumed prejudice based on the length of the delay in providing notice of a claim. Given the strong language in several cases that prejudice is rarely presumed and in the absence of contrary authority, we hold that prejudice cannot be presumed in this case.

6.    Restriction of Evidence

LMI argues that the trial court erroneously limited the type of evidence LMI could use to show prejudice. LMI addresses this argument in only three sentences in its opening brief, and in one sentence in its reply brief. However, LMI does not cite to any orders issued by the trial court limiting the evidence that it could present at trial. Instead, LMI appears to refer to the trial court's November 5, 2013 summary judgment order, which stated, "There is a question of fact regarding whether the Port's late notice has prejudiced LMI's ability to investigate the TPH site." CP at 16865.

We reject LMI's argument because LMI does not show in the record that the trial court expressly limited the evidence it could present at trial on the late notice prejudice issue. To the extent that the trial court's summary judgment orders or other orders had the effect of limiting evidence, LMI was required to address this issue in the appeal of those orders.

7.    Prejudice Jury Instruction

LMI argues that the trial court erred in giving jury instruction 10 because it improperly limited the evidence that the jury could consider when deciding whether the Port's late notice prejudiced LMI. We disagree.

We review the trial court's choice in jury instruction for an abuse of discretion. *Fergen v. Sestero*, 182 Wn.2d 794, 802, 346 P.3d 708 (2015). A jury instruction is sufficient if it properly informs the jury of the applicable law, allows each party to argue their theory of the case, and is supported by substantial evidence. *Id.* at 803. The facts of the case govern the propriety of a jury instruction. *Id.*

In order to preserve a challenge to a jury instruction for review, a party must make a proper objection. *Millies v. LandAmerica Transnation*, 185 Wn.2d 302, 313, 372 P.3d 111 (2016). CR 51(f) requires a party objecting to a jury instruction to "state distinctly the matter to which counsel objects and the grounds of counsel's objection." On appeal, the pertinent inquiry is " 'whether the exception was sufficient to apprise the trial judge of the nature and substance of the objection.' " *Washburn v. City of Fed. Way*, 178 Wn.2d 732, 746, 310 P.3d 1275 (2013) (quoting *Crossen v. Skagit County*, 100 Wn.2d 355, 358, 669 P.2d 1244 (1983)).

The trial court instructed the jury on the late notice defense in instruction 10, stating that it had determined with regard to the TPH site that the Port's notice to LMI was late and that LMI had the burden of proving that the late notice caused actual and substantial prejudice. The instruction also stated:

> In determining whether LMI has proved their affirmative defense of late notice of the TPH site, you should consider the following:
>
> 1) Whether LMI was actually and substantially prejudiced by LMI's alleged inability to pursue Calloway Ross for additional contribution towards cleanup costs at the TPH site;
>
> 2) Whether LMI was actually and substantially prejudiced by the change in site conditions;
>
> 3) Whether LMI was actually and substantially prejudiced by the Port's signing of the May 19, 1998 Chevron Agreement.

CP at 18644. LMI objected to this paragraph but did not state the basis of the objection.

Instruction 10 lists three things that the jury "should" consider when deciding whether LMI suffered actual and substantial prejudice – LMI's inability to pursue Calloway Ross, the change in site conditions, and the Port's signing of the Chevron agreement. But the instruction does not state that the jury could consider *only* those factors. Nothing in the language of instruction 10 prevented LMI from arguing that is was prejudiced based on other evidence. In addition, the phrase "change of site conditions" is broad enough a allow consideration of a wide range of evidence.

Arguably, instruction 10 is ambiguous because it could be interpreted as instructing the jury that they could consider only these three factors. But LMI did not articulate this potential ambiguity in its objection to instruction 10. LMI simply stated without further explanation, "The Court's number ten we object to because of adding the second paragraph and paragraphs

numbered one, two and three." RP (Nov. 19, 2013) at 2008. This objection was not sufficient to " 'apprise the trial judge of the nature and substance of the objection.' " *Washburn*, 178 Wn.2d at 746 (quoting *Crossen*, 100 Wn.2d at 358.). Therefore, LMI did not preserve any challenge to the instruction on that basis.

Instruction 10 did not prevent either party from arguing its theory of the case. The instruction highlighted three factors, but did not expressly preclude LMI from arguing that other evidence showed prejudice. Accordingly, we hold that the trial court did not abuse its discretion by giving instruction 10.

C.      KNOWN LOSS PRINCIPLE

The Port purchased the IP plant area in 1999 with knowledge that the property purchased was contaminated. LMI argues that (1) the Port had no liability for contamination at the IP plant area apart from this purchase, and (2) the known loss principle precludes the Port from obtaining coverage for contamination it knew existed at the time it purchased the IP plant area.[13] We hold that the 1999 purchase of the IP plant is immaterial to coverage because whether the known loss principle applies is based on the insured's knowledge at the time LMI's insurance policies were issued.

1.      Legal Principles

Under the known loss principle, an insured cannot obtain insurance coverage for a loss if the insured subjectively knew, at the time the insurance policy was issued, that there was a substantial probability that the loss would occur. *Klickitat*, 124 Wn.2d at 805. For liability insurance, a "loss" refers to the insured's liability to a third party. *See id.* at 806, 808 (approving

---

[13] LMI does not make a known loss argument regarding the TPH site.

jury instruction applying known risk only if the insureds knew they would be sued for securities violations).

The known loss principle does not preclude coverage simply because that insured may know when an insurance policy is issued that some unspecified loss might occur.

> The knowledge that some loss may occur in the future is the driving force behind the purchase of insurance. A finding that this general knowledge precludes coverage would be much too broad.

*Id.* at 808.

Because the known loss principle has the effect of an exclusion, the insurer has the burden of proving that the insured knew the particular loss would occur. *Alum. Co. of Am. v. Aetna Cas. & Surety Co.*, 140 Wn.2d 517, 556, 562, 998 P.2d 856 (2000) [hereinafter *ALCOA*].[14] Application of the known loss principle generally presents a question of fact. *Klickitat*, 124 Wn.2d at 805.

2. No Knowledge When Policies Were Issued

LMI argues that the known loss principle should apply because the Port purchased the IP plant area in 1999 knowing that it was contaminated. But as noted above, the known loss principle applies only if the insured had knowledge of the loss *at the time the insurance policies were issued*. *Klickitat*, 124 Wn.2d at 805; *see also Overton v. Consol. Ins. Co.*, 145 Wn.2d 417, 426, 38 P.3d 322 (2002) (stating that "the issue is whether [the insured] knew of the loss prior to purchasing the insurance"). LMI's policies here were issued between 1977 and 1984. The

---

[14] *ALCOA* involved application of Pennsylvania law, and the Supreme Court was attempting to predict how a Pennsylvania court would rule on the issue. 140 Wn.2d at 557. However, the court gave no indication that it would apply a different rule under Washington law.

Port's 1999 purchase of the IP plant property obviously occurred long after those policies were issued. Therefore, the known loss principle does not apply to that property.

LMI briefly argues on appeal that the known loss principle should apply to the MFA because the Port knew in the 1960s that the area contained an unlined ditch into which IP had been discharging contaminated wastewater. But LMI did not make any known loss arguments regarding the MFA in the trial court. Accordingly, we decline to address this argument. In any event, LMI does not show or even argue that the Port knew that they had potential liability at the MFA before LMI issued its policies.

D.      OCCURRENCE REQUIREMENT

LMI argues that the Port's liability did not arise from an "occurrence" as a matter of law as required under the LMI primary and excess policies because (1) at the IP plant area, the Port expected and intended groundwater contamination when it purchased that property in 1999; and (2) at both the TWP and TPH sites, the Port did not present sufficient evidence at trial to prove that it did not expect or intend groundwater contamination before the last LMI policy was issued in 1984. Therefore, LMI argues that the trial court erred in denying its CR 50 motions for judgment as a matter of law.

We hold that (1) the Port's 1999 purchase of the IP plant area is immaterial because whether the insured expected or intended property damage is determined at the time the policies are issued, and (2) the trial court did not err in denying LMI's motions for judgment as a matter of law because the evidence was sufficient to support the jury's finding that the Port did not expect groundwater contamination before LMI issued its policies.

1.    Policy Language

The insuring clauses of LMI's primary insurance policies state that LMI will provide coverage for damage to property of others as a result of an accident or occurrence.  The primary policies do not define "occurrence".

LMI's excess policy AN 5707 provides coverage for damage to property of others caused by an occurrence.  That policy states that the term "occurrence" will have the same meaning as in the primary policies underlying that policy.

LMI's other excess policies also provide coverage for property damage caused by or arising out of an occurrence.  The policies define "occurrence" as "an accident or a happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in . . . property damage."  Pl.'s Ex. 40 (JSL 1021), Pl.'s Ex. 105 (JSL 1041), Pl.'s Ex. 15 (JSL 1065), Pl.'s Ex. 16 (JSL 1087), Pl.'s Ex. 17 (JSL 1136), Def.'s Ex. 340 (JSL 1055).

2.    Unchallenged Jury Instructions

Despite the absence of the definition of "occurrence" in the primary policies and one of the excess policies, the trial court provided jury instructions on the occurrence requirement. Instruction 8 provided:

> In order to prove that the Port's claims are covered by the London Market Insurers' policies, the Port must prove by a preponderance of the evidence, that there has been an occurrence under the policies.
>
> The term "occurrence" as used in the Port of Longview's insurance policies means: a continuous or repeated exposure to conditions, which results in property damage neither expected nor intended from the standpoint of the insured.
>
> The Port of Longview has the burden of proving by a preponderance of the evidence that it did not expect or intend the contamination for which it alleges it is entitled to insurance coverage.

CP at 18642. Instruction 9 provided:

> Property damage is "expected or intended" by an insured if the insured had knowledge, *prior to purchasing the insurance policy*, indicating that there was a substantial probability the property damage (here, groundwater contamination exceeding MTCA cleanup standards) would occur.

CP at 18643 (emphasis added).

The trial court's instructions are generally consistent with Washington law on the occurrence requirement. The insured has the burden of proving that the property damage was not expected or intended. *Queen City Farms, Inc. v. Central Nat'l Ins. Co. of Omaha*, 126 Wn.2d 50, 70-72, 882 P.2d 703, 891 P.2d 718 (1994). The trial court's "substantial probability" standard derives from *Overton*, 145 Wn.2d at 425.

LMI objected to portions of instructions 8 and 9 in the trial court. But LMI has not assigned error to these instructions on appeal. Therefore, they are the law of this case. *Campbell v. City of Bellevue*, 85 Wn.2d 1, 6, 530 P.2d 234 (1975).

### 3. No Expectation for IP Plant Area When Policies Were Issued

LMI argues that the Port cannot satisfy the occurrence requirement because it purchased the IP plant area in 1999 expecting and knowing that the property was contaminated. But as with the known loss principle and as stated in instruction 9, the occurrence requirement addresses whether the insured expected property damage *at the time the insurance policies were issued*. *See Overton*, 145 Wn.2d at 431. LMI's policies here were issued between 1977 and 1984. The Port's 1999 purchase of the IP plant property obviously occurred long after those policies were issued. Therefore, whether the Port expected property damage at the IP plant area when it purchased that property in 1999 is immaterial to the occurrence requirement.

### 4. Sufficiency of the Evidence

LMI argues that the Port did not present sufficient evidence to support the jury's finding that the Port did not expect or intend property damage at both the TWP and TPH sites. We disagree.

We review the trial court's denial of a motion for judgment as a matter of law de novo. *Washburn*, 178 Wn.2d at 752-53. On review, we engage in the same inquiry as the trial court. *Mut. of Enumclaw Ins. Co. v. Gregg Roofing, Inc.*, 178 Wn. App. 702, 725, 315 P.3d 1143 (2013). In reviewing the motion, we admit the truth of the nonmoving party's evidence and all reasonable inferences that can be drawn from it. *Id.* A motion for judgment as a matter of law should be granted if we can find, as a matter of law, that there is no substantial evidence or reasonable inference to sustain a verdict for the nonmoving party. *Id*

### a. O'Hollaren Testimony

The Port's primary evidence that it did not expect or intend groundwater contamination before any of the policy periods (1977-1985) came from the testimony of Kenneth O'Hollaren, who was employed at the Port from 1980 until 2012. O'Hollaren worked as the assistant operations manager, supervising day-to-day marine terminal operations, from 1980 until 1982. He testified that his work as assistant operations manager required him to drive around the Port docks regularly to supervise activities. He also testified that this work put him in regular contact with the engineering and facilities department. O'Hollaren then was the assistant to the Port general manager from 1982 until 1988, when he became the Port's executive director.

In summary, O'Hollaren testified that he did not personally have any expectation or intention of groundwater contamination at either TWP or TPH between 1980 and 1987. He also testified that he did not recall any discussion about groundwater contamination between 1980

and 1987 with respect to either site. And he testified that based on his positions at the Port during that time period, if groundwater contamination was a concern, he would have been aware of that fact.

O'Hollaren first had contact with the Port and became familiar with Port facilities while working as a steamship agent between 1977 and 1979. He testified that he did not recall any conversations about contamination at either the TWP or TPH sites during that period.

When he joined the Port, O'Hollaren had conversations with Port personnel. He did not recall any conversations at that time about expectation or intention regarding contamination before 1980.

O'Hollaren also testified that he did not recall any conversations about contamination as part of his close work with the engineering and facilities department.

Q. . . . When you testified earlier, you talked about close operation between the engineering and facilities departments and operations. Do you recall that testimony?

A. Yes.

Q. Do you recall ever having discussions about groundwater contamination between 1980 and 1987 as part of that work?

. . . .

[A.] No, I don't recall any discussion like that.

[Q.] Is that the kind of thing that you would have been discussing when you talked about the operations between these departments?

A. Any matters of importance to the physical plant typically would, you know, just come up in the normal course of conversation that would affect operations, could affect planning, and so that would be something that would come up to the extent that it affected that, but I don't recall any discussion like that.

. . . .

37

A.  Any matters or issues or developments pertaining to the Port itself, the physical plant of the Port, having to do with the facilities, the roadways, the land, these are just all topics of conversation between engineering and operations and the executive leadership as well that could impact, you know, existing operations or future operations.

Q.  So if there had been some concern about expectations or intentions about groundwater contamination between 1980 and 1987 at the Port, would that have been the kind of thing that would have been in that - - those types of conversations?

A.  Yes, they would have been.

RP (Nov. 7, 2013) at 577-79.

O'Hollaren stated that he did not recall any conversations about contamination at either

site:

Q. . . .  With respect to the TPH site, do you recall ever having such discussions or hearing mention of an expectation or intention of groundwater pollution between 1980 and 1987?

. . . .

[A.]  No, I don't have any recollection of that, no.

[Q.]  Okay.  And then with respect to the TWP site, do you recall, do you ever -- do you have any such recollections about those types of conversations with respect to the TWP site during that time period?

. . . .

[A.]  I have no recollection of anything to do with the TWP site.

RP (Nov. 7, 2013) at 579-80.

Finally, O'Hollaren indicated on cross examination that the Port had first discovered

contamination at the TPH site in 1991.

Q.  [The TPH] site was discovered by the Port in 1991, is that correct?

A.  That's correct.

Q. And it was discovered when the Port was pulling an underground gasoline storage tank from the Calloway Ross leasehold, right?

A. That's correct.

RP (Nov. 7, 2013) at 592.

O'Hollaren's testimony provides some direct evidence, and creates at least an inference, that the Port was not aware of groundwater contamination at either the TWP site or the TPH site before 1987. And his testimony on cross examination creates at least an inference that the Port did not know of groundwater contamination at the TPH site until 1991.

LMI argues that O'Hollaren's testimony is insufficient to establish the Port's lack of knowledge because he was not working for the Port in the 1960s and 1970s. However, this type of argument relates to the weight of the Port's evidence, not the sufficiency.

b.    Krehbiel Testimony

The Port also presented evidence regarding the MFA from Norm Krehbiel, who became the Port's director of facilities and engineering in 1993. Krehbiel testified that he did not personally expect or intend or hear any discussions about groundwater contamination at the MFA between 1993 and 1996. Although Krehbiel joined the Port after the relevant time period, if the Port was aware of groundwater contamination at the MFA, the director of facilities and engineering presumably would have been aware of that fact. Therefore, this testimony could create an inference that the Port did not know about groundwater contamination at the MFA until at least 1996.

More significantly, Krehbiel testified that in 1992 the Port constructed a new million dollar facility on the MFA that incorporated more environmentally friendly designs than the old facility. This evidence creates an inference that the Port was unaware of any MFA

contamination at that time because it would make little sense to construct a new building on contaminated property.

c.   Beard Testimony

The Port's expert witness, Lawrence Beard, testified that the lineament ditch present on both the IP plant area and the MFA was in use from the late 1940s until the 1960s to convey wastewater. Beard testified that the use of unlined wastewater ditches was not a cause of environmental concern until the mid to late 1970s. This testimony arguably creates an inference that the Port had no reason to expect or intend groundwater contamination when the ditch was in use.

d.   Conclusion

Although the Port's evidence is not overwhelming, we hold that it is sufficient. We must make all reasonable inferences from the evidence and view the evidence in the light most favorable to the Port. O'Hollaren's and Krehbiel's testimony give rise to inferences that the Port was unaware of groundwater contamination before 1996 for the TWP site and 1991 for the TPH site. The building of the new facility on the MFA area and the circumstances of the Port's discovery of the TPH contamination also allow inferences that the Port was unaware of any groundwater contamination during the early 1990s. Those inferences, in turn, support the inference that the Port did not expect or intent contamination before that time.

We hold that the Port presented sufficient evidence to persuade a rational and fair-minded person that the Port did not expect or intent groundwater contamination before the relevant policy periods. Accordingly, we hold that the trial court did not err in denying LMI's motions for judgment as a matter of law on the occurrence requirement.

E.        QUALIFIED POLLUTION EXCLUSION

LMI argues that the qualified pollution exclusions in the excess policies preclude coverage under those policies.  LMI claims that the trial court erred in (1) stating in a jury instruction and the special verdict form that under the pollution exclusion, the Port was required to prove that it did not expect or intend the release of contaminants to groundwater as opposed to the release of contaminants more generally into the environment; and (2) denying LMI's motions for judgment as a matter of law under CR 50(a) and (b) because the Port failed to present sufficient evidence that it did not expect or intend the release of contaminants.

We hold that LMI waived its challenge to the trial court's pollution exclusion jury instruction and special verdict form because it did not object to the instruction and verdict form in the trial court.  We also hold that the trial court did not err in denying LMI's motions for judgment as a matter of law because the evidence was sufficient to support the jury's finding that the Port did not expect or intend the release of contaminants to the groundwater before the applicable policy periods.

1.    Policy Language

Although LMI's primary policies did not contain qualified pollution exclusions, LMI's excess policies contained identical pollution exclusions.  These exclusions provided that the insurance did not apply to property damage arising out of the "discharge, disbursal, release or escape of . . . contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water."  CP at 18602.  But the pollution exclusions contained an exception to the exclusion:  "[T]his exclusion does not apply if such discharge, disbursal, release or escape is sudden and/or accidental."  CP at 18602.

2.    Pollution Exclusion Jury Instruction

The trial court instructed the jury on the pollution exclusion in instruction 11:

> You are instructed that there is no dispute that the property damage alleged by the Port arises out of the discharge, dispersal, release or escape of contaminants or pollutants.  Certain policies subscribed to by the London Market Insurers contain a pollution exclusion which bars coverage for the Port's claims unless the Port proves by a preponderance of the evidence that the discharge, dispersal, release or escape of contaminants or pollutants into the groundwater was sudden and accidental. "Sudden and accidental" means "unexpected and unintended."
>
> The Port of Longview has the burden of proving that it did not expect the discharge or release of contaminants into the groundwater.
>
> You must determine whether the Port has met its burden of proving by a preponderance of the evidence that it did not expect or intend the discharge, dispersal, release or escape of contaminants or pollutants into the groundwater.

CP at 18645.

The special verdict form asked the jury for both the TWP and the TPH site "whether you find by a preponderance of the evidence, that the Port of Longview has met its burden of proving that the Port did not subjectively expect or intend the release of contamination to groundwater prior to the policy period."  CP at 18650.

Instruction 11 generally is consistent with Washington law. The Supreme Court in *Queen City Farms* held that the term "sudden and accidental" in the exception to the pollution exclusion clause means "unexpected and unintended." 126 Wn.2d at 86-87. And the pollution exclusion focuses on the discharge or release of contaminants into the environment rather than property damage. *Id*. at 87. Therefore, the exclusion does not apply if the *discharge or release* of contaminants is unexpected or unintended. *Id*. Further, if contaminants are deposited in a place of containment, the relevant release is the escape of contaminants from that place into the environment. *Id*. at 79, 91. Finally, the instruction placed the burden of proof on the Port. No Washington case has addressed who has the burden of proof on the "sudden and accidental" exception to the qualified pollution exclusion, but courts in other jurisdictions have placed the burden of proof on the insured. *E.g.*, *Aydin Corp. v. First State Ins. Co.*, 18 Cal. 4th 1183, 959 P.2d 1213, 1215-18 (1998).

Regardless of the specific details of Washington law, LMI did not object to instruction 11 in the trial court. Therefore, it is the law of this case. *Millies*, 185 Wn.2d at 313.

3. Waiver of Jury Instruction/Special Verdict Form Challenges

LMI assigns error to the trial court's giving of instruction 11 and giving the special verdict form. However, LMI did not object to instruction 11 or the special verdict form in the trial court. A party that fails to object to a jury instruction waives the ability to challenge that instruction on appeal. RAP 2.5(a); *Hudson v. United Parcel Serv., Inc.*, 163 Wn. App. 254, 269, 258 P.3d 87 (2011).

Accordingly, we decline to consider LMI's arguments that the trial court erred in giving instruction 11 on the pollution exclusion and in giving the special verdict form.

4.    Sufficiency of the Evidence

LMI argues that the Port did not present sufficient evidence to support the jury's finding that the Port did not expect or intend the discharge or release of contaminants into the groundwater at both the TWP and TPH sites.  We disagree.

To show the exception to the pollution exclusion applied, the Port had to prove that it did not subjectively expect or intend the release of contaminants to the groundwater before the relevant policy periods (1977-1985).  Because the property damage for which the Port sought coverage was the contamination of groundwater, the Port's burden for the pollution exclusion essentially was the same as its burden to prove an occurrence – that it did not expect or intend the groundwater contamination.  The Supreme Court acknowledged in *Queen City Farms* that the inquiry might be the same for the occurrence requirement and the qualified pollution exclusion:

> We note that because we conclude that the relevant polluting event may be the discharge, dispersal, release, or escape of material from a landfill or similar place of containment, the damage/discharge distinction may be insignificant in many cases as a practical matter.

126 Wn.2d at 89.

As discussed above, the Port presented sufficient evidence to show that it did not expect or intend groundwater contamination at the TWP site or the TPH site before LMI issued its policies.  That same evidence – the testimony of O'Hollaren, Krehbiel, and Beard – also supports the jury's finding that the Port met its burden to show that the Port did not expect or intend the release of contaminants into groundwater at either site.

We hold that there was sufficient evidence that the Port did not expect or intend the release of contaminants to the groundwater at either TWP or TPH before the relevant policy

periods. Accordingly, we hold that the trial court did not err in denying LMI's motions for judgment as a matter of law on the pollution exclusion.

F. *OLYMPIC STEAMSHIP* ATTORNEY FEES

LMI argues the Port's breach of the notice provision in LMI's policies precludes the Port from recovering attorney fees under *Olympic Steamship*. We agree with regard to the Port's claims under the primary policies but hold that the Port is entitled to recover attorney fees under the excess policies.

1. Legal Principles

Generally, a party cannot recover attorney fees absent a contract term or statute allowing for recovery. *Klickitat*, 124 Wn.2d at 814. But in insurance coverage cases, the Supreme Court in *Olympic Steamship Co. v. Centennial Insurance Co.* adopted an equitable exception to the general rule. 117 Wn.2d 37, 52-54, 811 P.2d 673 (1991). The court held that "[a]n insured who is compelled to assume the burden of legal action to obtain the benefit of its insurance contract is entitled to attorney fees." *Id.* at 54.

The court premised its reasoning in *Olympic Steamship* on the fact that insurance contracts are "substantially different from other commercial contracts" because of the disparity of bargaining power between the insurer and the insured. *Id.* at 52. The court also noted that the purpose of seeking insurance is to protect the insured from expenses, not to force the insured to engage in time-consuming and expensive litigation with the insurer. *Id.* Finally, the court noted that allowing the insured to recoup attorney fees expended to obtain the benefit of its insurance would "encourage the prompt payment of claims" by insurers. *Id.* at 53.

Whether a party is entitled to attorney fees under *Olympic Steamship* is a question of law that we review de novo. *Colo. Structures, Inc. v. Ins. Co. of the W.*, 161 Wn.2d 577, 586, 167 P.3d 1125 (2007). *Olympic Steamship* applies where the insurer forces the insured to litigate over questions of coverage. *Cmty. Ass'n Underwriters of Am., Inc. v. Kalles*, 164 Wn. App. 30, 40, 259 P.3d 1154 (2011). Coverage questions concern whether the insurance contract exists, who is insured under the contract, and the type of risk insured against. *Id.*

However, in *Klickitat* the Supreme Court indicated that not every insured who is successful in litigation against its insurer is entitled to attorney fees under *Olympic Steamship*:

> We cannot authorize the imposition of attorney fees, however, *when an insured has undisputedly failed to comply with express coverage terms*, and the noncompliance may extinguish the insurer's liability under the policy. . . . [T]he insureds in this case took actions inconsistent with the express coverage terms of their policies. Although we have found they are nonetheless entitled to the insurance proceeds because the insurers were not actually prejudiced by their noncompliance, *we cannot justify an attorney fees award under these circumstances*.

124 Wn.2d at 815 (emphasis added). In *Klickitat*, the insured violated a policy term when it settled with claimants without the consent of the insurer. *Id.* at 802-03.

Similarly, in *Liberty Mutual Insurance Co. v. Tripp*, the Supreme Court held that regardless of whether the insurer was actually prejudiced, the insured was not entitled to *Olympic Steamship* attorney fees when the insured failed to comply with the policy's notice of settlement provision. 144 Wn.2d 1, 20, 25 P.3d 997 (2001). The court reasoned the insured could not recover attorney fees because it was the insured's actions – failing to notify the insurer of settlement and allowing the destruction of the insurer's subrogation rights – that precipitated the litigation. *Id.*

2.    Recovery of Attorney Fees Under Primary Policies

No Washington appellate court has addressed whether an insured is precluded from obtaining *Olympic Steamship* attorney fees by failing to provide prompt notice in violation of the applicable insurance policies.  But the holding in *Klickitat* is equally applicable to the Port's claim for coverage under the primary policies.  The trial court ruled, and the Port does not dispute, that the Port breached the notice provisions in the primary policies.  As in *Klickitat*, although LMI is obligated to provide coverage because it could not show prejudice, the Port "undisputedly failed to comply with express coverage terms." *Klickitat*, 124 Wn.2d at 815. Further, the Port's failure to give prompt notice was an integral part of the litigation and trial in this case.

We do not believe that *Klickitat* stands for the proposition that any violation of a late notice provision, however minor, precludes an insured from recovering *Olympic Steamship* attorney fees.  But here, the Port does not dispute that it had actual knowledge that it potentially was liable for groundwater contamination at both the TWP and TPH sites for many years before attempting to give notice and that DOE actually asserted a claim against the Port at the TWP site five years before it gave notice.  Further, whether the Port's late notice prejudiced LMI was one of the major issues in this litigation.

*Klickitat* has not been overruled or even questioned on this issue. Therefore, we are constrained to hold that an attorney fee award in favor of the Port for obtaining coverage under the primary policies is not justified under the circumstances of this case.[15]

### 3. Recovery of Attorney Fees Under Excess Policies

The analysis is different for LMI's excess policies. The trial court did not hold that the Port breached the notice provisions of the excess policies. With regard to those policies, *Klickitat* is inapplicable because the Port did not "[fail] to comply with express coverage terms." *Klickitat*, 124 Wn.2d at 815. And the Port successfully litigated on the seven excess policies as well as on the four primary policies. Therefore, we hold that the Port is entitled to recover *Olympic Steamship* attorney fees for obtaining coverage under the excess policies.

Because the Port is entitled to recover attorney fees for its claims under the excess policies but not under the primary policies, the trial court must determine the amount of attorney fees that should be awarded for the Port's claims under the excess policies. We remand to the trial court for that determination.

### 4. Obtaining Benefit of Insurance

LMI argues that even if the Port is entitled to recover *Olympic Steamship* attorney fees, the trial court should have refused to award any attorney fees here because the Port did not obtain any significant benefit under the policies from the litigation. Because this issue may arise

---

[15] LMI also argues that the Port's voluntary payments pursuant to the 1998 Chevron agreement preclude recovery of *Olympic Steamship* attorney fees. But none of the primary policies or excess policies contained provisions prohibiting voluntary payments. Therefore, the Port did not fail to comply with express policy provisions in this regard.

on remand, we address LMI's argument with regard to the excess policies to give guidance to the trial court. We disagree with LMI.

*Olympic Steamship* holds that an insured can recover attorney fees in a "legal action to obtain the benefit of its insurance contract." 117 Wn.2d at 54. LMI claims that the Port did not obtain any real benefit as a result of this litigation because it voluntarily dismissed its damages claim and whether coverage exists for specific future claims still must be litigated. LMI also points out that there is no pending claim against the Port on the TWP site and the Port is voluntarily investigating and remediating the TPH site without government compulsion. Finally, LMI notes that the Port still must show that the primary policies have been exhausted before it can obtain any coverage under the excess policies.

However, the Port is strictly liable and jointly and severally liable under MTCA for extensive groundwater contamination at both the TWP site and the TPH site. Based on the evidence presented at trial, it appears that the Port's potential liability at these sites is extensive and could implicate the excess policies. In the face of this liability, the Port obtained a declaration that LMI is obligated under the excess policies to indemnify the Port (if the primary policies are exhausted) against all claims arising out of environmental liabilities at both sites. There is no question that this declaration regarding the excess policies represents a significant benefit to the Port.

LMI may be correct that the Port's declaratory judgment does not automatically resolve all coverage issues regarding future claims and that coverage will not even be triggered under the

49

excess policies until the primary policies are exhausted. However, in any future litigation involving the excess policies the Port will not need to address (1) the known loss principle, (2) the occurrence requirement, and (3) the pollution exclusion. Resolving these significant coverage issues constitutes a significant benefit to the Port.

We hold that as required in *Olympic Steamship*, the Port has obtained significant benefits under the LMI excess policies in this litigation.[16]

5.     Reasonableness of Attorney Fee Award

LMI argues that the trial court erred regarding the amount of attorney fees awarded because the award included attorney fees (1) for duplicative, unproductive and excessive time, (2) already awarded as sanctions, (3) incurred in the mistrial caused by the Port's misconduct, (4) incurred in litigation against other defendants, and (5) relating to administrative and clerical tasks.[17] Because the amount of reasonable attorney fees will be relevant on remand, we address this argument to give guidance to the trial court. We disagree with LMI.

We review the reasonableness of the amount of attorney fees awarded for an abuse of discretion. *Gander v. Yeager*, 167 Wn. App. 638, 647, 282 P.3d 1100 (2012). A trial court abuses its discretion if its decision was manifestly unreasonable or based on untenable grounds or untenable reasons. *Barton*, 178 Wn.2d at 215.

---

[16] By so ruling, we do not address whether the trial court can consider on remand, if appropriate, the extent of the Port's benefits under the excess policies in determining the amount of attorney fees to award for the Port's excess policy claims.

[17] LMI also argues that attorney fees relating to the Port's unsuccessful activities are not recoverable even though the Port ultimately prevailed at trial. However, LMI did not raise this issue in the trial court. Therefore, we decline to address this argument.

A trial court's award of attorney fees must be supported by findings of fact and conclusions of law. *Berryman v. Metcalf*, 177 Wn. App. 644, 658, 312 P.3d 745 (2013). "Courts must take an *active* role in assessing the reasonableness of fee awards, rather than treating cost decisions as a litigation afterthought. Courts should not simply accept unquestioningly fee affidavits from counsel." *Mahler v. Szucs,* 135 Wn.2d 398, 434-35, 957 P.2d 632, 966 P.2d 305 (1998). A trial court abuses its discretion when it enters conclusory findings that fail to explain the court's analysis and address specific objections to fee amounts. *Berryman*, 177 Wn. App. at 658-59.

Here, the trial court specifically addressed LMI's arguments. The trial court (1) disagreed that having four attorneys attend a motion hearing in December 2012 was duplicative; (2) deducted $114,229 in fees for unproductive time, including fees relating to the Port's damages claim that was voluntarily dismissed; (3) disallowed a small amount for excessive time and an amount for excessive costs; (4) explained that it was awarding attorney fees relating to discovery even though it declined to award those fees as sanctions; (5) allowed a portion of fees incurred for preparation of the first trial because they carried over to the second trial; (6) found that the amount of time spent on matters exclusively relating to other defendants was inconsequential; and (7) awarded amounts for administrative and clerical tasks under *Panorama Village Condominium Owners Association Board of Directors v. Allstate Insurance Co.*, 144 Wn.2d 130, 144, 25 P.3d 910 (2001).

LMI provides no meaningful argument supporting its challenge to these rulings. The trial court's findings indicate that it did not unquestioningly accept the Port's fee requests, but instead it carefully considered the reasonableness of the request and LMI's objections. The trial court excluded certain fees pursuant to LMI's objections and explained why it allowed fees over LMI objection. Therefore, we hold that the trial court did not abuse its discretion in determining the gross amount of recoverable attorney fees. On remand, the trial court will have to determine what portion of that amount should be allocated to the Port's claims under the excess policies.

G.      ATTORNEY FEES ON APPEAL

Pursuant to RAP 18.1 and *Olympic Steamship*, the Port requests reasonable attorney fees incurred in defending against LMI's appeal. RAP 18.1 allows a party to recover reasonable attorney fees on review if applicable law grants the party the right to attorney fees. As discussed above, under *Olympic Steamship* and *Klickitat* the Port is entitled to recover attorney fees for its claims under the excess policies but not the primary policies. Therefore, we award to the Port those reasonable attorney fees on appeal that relate to the Port's claims under the excess policies.

CONCLUSION

We affirm the trial court's declaratory judgment orders but reverse the trial court's attorney fee order and remand for the trial court to determine the amount of attorney fees that should be awarded for the Port's claims under the excess policies.

No. 46654-6-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

MAXA, J.

We concur:

WORSWICK, J.

BJORGEN, C.J.